NATIONAL ASSOCIATION OF
POSTAL SUPERVISORS

v.

UNITED STATES POSTAL SERVICE
et al., Appellants.

NATIONAL ASSOCIATION OF POST-
MASTERS OF the UNITED
STATES et al.

v.

UNITED STATES POSTAL SERVICE
et al., Appellants.

NATIONAL ASSOCIATION OF POST-
MASTERS OF the UNITED
STATES et al., Appellants,

v.

UNITED STATES POSTAL SERVICE
et al.

Nos. 77–1684, 77–1685 and 77–1690.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1978.

Decided June 14, 1979.

As Amended July 3, 1979.

Rehearing Denied Aug. 2, 1979.

**422**

Stephen E. Alpern, Atty., U. S. Postal Service, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Stephen S. Cowen, Asst. U. S. Attys., Washington, D. C., were on the brief for appellants.

David C. Todd, Washington, D. C., with whom Linda Elizabeth Buck, Washington, D. C., was on the brief, for appellee National Ass'n of Postal Supervisors.

Isaac N. Groner, Washington, D. C., with whom Raymond D. Battocchi, and Neal M. Sher, Washington, D. C., were on the brief, for the appellee National Ass'n of Postmasters of the U. S. and National League of Postmasters of the U. S., appellants in No. 77–1690 and appellee in No. 77–1685.

Before WRIGHT, Chief Judge, and BAZELON and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

These consolidated cases are appeals from a district court judgment directing the United States Postal Service to provide immediate salary increases of 6% to 8% per annum to certain management personnel and thereafter to maintain a salary differential of approximately 24% between those personnel and the rank-and-file workers. The district court based its judgment on section 1004(a) of the Postal Reorganization Act, 39 U.S.C. § 101 *et seq.*, which requires the Postal Service to provide "adequate and reasonable" salary differentials between management personnel and the employees in the clerk and carrier grades. We believe that the district court's judgment intrudes into an area preserved for administrative discretion, and we consequently reverse and remand to the district court for further proceedings consistent with this opinion.

**I**

Appellants in Nos. 77–1684 and 77–1685 include the United States Postal Service, the Postmaster General, the Deputy Postmaster General, the Governors of the United States Postal Service sued individually, and the Board of Governors of the United States Postal Service sued as an entity (hereafter collectively referred to as "Postal Service").[1] The Postal Service argues that

---

1. The Postal Service has the power "to sue and be sued in its official name." 39 U.S.C. § 401(1) (1976). Hence the Governors of the Postal Service are not heads of a department

the district court lacked subject matter jurisdiction over the controversy, and, alternatively, that it exceeded its review authority in ordering specific salary increases and a fixed differential. The appellees are the National Association of Postal Supervisors ("Supervisors"), the National Association of Postmasters of the United States ("NAPUS"), and the National League of Postmasters of the United States ("Postmasters League") (hereafter collectively referred to as "Associations"). NAPUS and the Postmasters League are in the posture of appellants in No. 77–1690. They argue that the district court erred in excluding certain postmasters from the class of management personnel entitled to salary increases under its judgment. The Postal Service, as appellee, asserts that the district court was without authority to resolve this issue, and in any event correctly excluded the postmasters from the judgment.

The facts are largely undisputed, though elaborate. The following exposition is divided into an explanation of the relevant statutory provisions, the Postal Service's salary schedules, the events leading to this litigation, and the procedural history of the case.

### A

In 1970 Congress enacted the Postal Reorganization Act (hereafter "Postal Act"), Pub.L.No. 91–375, 84 Stat. 719, which created the Postal Service as "an independent establishment of the executive branch of the Government," 39 U.S.C. § 201 (1976). The Postal Act delegated broad general powers to the new agency, *see id.* § 401, and exempted the Postal Service unless otherwise specified, from all federal laws "dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including [the administrative procedure and judicial review provisions] of title

5," *id.* § 410(a). Among the specific powers delegated to the Postal Service is the power to set the salaries of its employees:

[T]he Postal Service shall classify and fix the compensation and benefits of all officers and employees in the Postal Service. It shall be the policy of the Postal Service to maintain compensation and benefits for all officers and employees on a standard of comparability to the compensation and benefits paid for comparable levels of work in the private sector of the economy.

*Id.* § 1003(a); *see id.* § 101(c).

Under the Postal Act, the salaries of rank-and-file employees—that is, those in the clerk and carrier grades—are established through collective bargaining agreements negotiated between the Postal Service and duly recognized unions. *Id.* §§ 1202–1209. The recognition of these unions, and, unless otherwise indicated, the general course of relations between management and the rank-and-file employees, are governed by the rules and regulations of the National Labor Relations Board. *Id.* § 1209. Supervisory and other managerial personnel, by contrast, are expressly excluded from representation in any collective bargaining unit. *Id.* § 1202(1). These personnel have no right to collective bargaining with respect to wages, hours, and other terms and conditions of employment. Instead, the Postal Act provides that duly recognized associations of supervisory and other managerial personnel are "entitled to participate directly in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to supervisory and other managerial employees." *Id.* § 1004(b). In addition, the Postal Act provides:

It shall be the policy of the Postal Service to provide compensation, working conditions, and career opportunities that

that has no capacity to sue and be sued as though it were a corporate entity. On this reasoning, we have had occasion to observe elsewhere that actions of this sort should be brought only against the Postal Service itself. *Association of Am. Publishers, Inc. v. Governors of the United States Postal Serv.,* 157

U.S.App.D.C. 397, 400, 485 F.2d 768, 771 (1973). As in that case, however, inasmuch as the Governors do not raise this issue on appeal and the matter is one without substantive significance, we proceed as though the action were properly brought.

will assure the attraction and retention of qualified and capable supervisory and other managerial personnel; *to provide adequate and reasonable differentials in rates of pay between employees in the clerk and carrier grades in the line work force and supervisory and other managerial personnel;* to establish and maintain continuously a program for all such personnel that reflects the essential importance of a well-trained and well-motivated force to improve the effectiveness of postal operations; and to promote the leadership status of such personnel with respect to rank-and-file employees, recognizing that the role of such personnel in primary level management is particularly vital to the process of converting general postal policies into successful postal operations.

*Id.* § 1004(a) (emphasis added).

### B

As of March 1976 the Postal Service employed approximately 685,000 workers in approximately 2,800 different job categories.[2] To meet its obligations to classify and fix the compensation and benefits of these employees, the Postal Service has developed salary schedules, four of which are relevant to this litigation. Each of the four schedules classifies postal employees according to grade, and these grades are usually further divided into steps.

2. The information regarding the Postal Service's salary schedules is taken, unless otherwise indicated, from the undisputed description of those schedules in the Affidavit of W. R. Masters, Director of the Office of Compensation of the United States Postal Service, ¶¶ 22–27 (March 18, 1976) ("Masters Affidavit"), the relevant portions of which appear in App. at 24–27. The complete affidavit appears in the original record in No. 77–1684 ("Record I"), accompanying the Postal Service's motion to Dismiss, or in the Alternative, for Summary Judgment. Record I, vol. I, at 12.

3. The Job Evaluation Program was initiated in 1971 in an effort, *inter alia,* to classify non-bargaining unit employees into grade similar to those found in comparable fields in the private sector. *See* p. —— of 195 U.S.App.D.C., p. 426 of 602 F.2d *infra.* The Program is discussed in detail in the unpublished memoran-

First there is the Postal Service schedule (hereafter "PS schedule"), which covers virtually all the rank-and-file employees represented by labor organizations acting as collective bargaining agents. The PS schedule is based on a job ranking system originally established by the Postal Field Service Compensation Act of 1955, Pub.L.No. 84–68, tit. II, 69 Stat. 88, and it is continued through collective bargaining under the Postal Act. There are approximately 600,-000 employees covered by the PS schedule, most of whom hold the grade PS–5.

Second there is the Postal Management schedule (hereafter "PMS schedule"), which covers supervisory employees classified in grades 1 through 16. These employees are excluded from representation in any collective bargaining unit, but many are members of the Supervisors association. The PMS schedule is based on a job ranking system recommended by the Postal Service's Job Evaluation Program and adopted by the Postal Service in 1973.[3] There are approximately 21,000 first-line supervisors covered by the PMS schedule, the vast majority of whom are in grade PMS–15.[4] Employees covered by this schedule, in addition to receiving general salary increases granted by the Postal Service, are eligible for periodic step increases within their grade.

Third there is the Postal Executive schedule (hereafter "PES schedule"), which covers supervisory and other managerial per-

dum opinion in *National Ass'n of Postal Supervisors v. Klassen,* Civ. No. 73–412 (D.D.C. decided Apr. 3, 1973), which is reproduced in the consolidated original record in Nos. 77–1685 and 77–1690 ("Record II"). Record II, vol. I, at 9.

4. First-line supervisors are personnel who supervise only non-supervisory employees and are generally found in grades 14 and above on the PMS schedule. The Postal Service employs approximately 1,500 supervisors in grade 13, approximately 20 in grade 12, and approximately 500 in grade 11.

At the outset of this litigation, there were some non-supervisory employees covered by the PMS and PES schedules yet included in collective bargaining units. These employees were placed in a new schedule effective June 1976.

sonnel in grades 17 through 42. With few exceptions, these employees are excluded from representation in any collective bargaining unit, though many are members of one of the Associations. The PES schedule, like the PMS schedule, is based on a job ranking system derived from the recommendations of the Job Evaluation Program. There are approximately 6,000 postmasters and 7,000 supervisors covered by the PES schedule. In addition to the general salary increases granted by the Postal Service, PES schedule employees are also eligible for annual increases by step.

Finally there is the Non-City Delivery schedule (hereafter "NCD schedule"), which covers all postmasters who oversee post offices that do not have city delivery services. These employees are excluded from any collective bargaining unit, but many are among the members of NAPUS or the Postmasters League. The NCD schedule was established in 1975 pursuant to the announcement of salary increases in issue here.[5] There are approximately 23,000 postmasters covered by the NCD schedule, the majority of whom are in grades NCD–12 and above. App. at 63. Owing to the limited nature of the postal operations for which they are responsible, postmasters in grades 1 through 7 typically do not have other Postal Service employees under their supervision. App. at 29. NCD schedule postmasters receive general salary and in-step increases in the same fashion as employees covered by the PMS and PES schedules.

### C

Before the enactment of the Postal Act in 1970 Congress directly classified postal positions and fixed the compensation and benefits of postal employees. *See, e. g.,* Federal Employees Salary Act of 1965, Pub.L.No. 89–301, 79 Stat. 1111; Postal Employees Salary Increase Act of 1960, Pub.L.No. 86–568, 74 Stat. 296. Congress included a salary increase in the Postal Act, Pub.L.No. 91–375, § 9(a), 84 Stat. 784 (1970), but delegated the authority to make future increases to the new agency. Shortly after the Postal Service formally replaced the old Post Office in July 1971, the agency completed negotiations with the unions representing its rank-and-file employees and signed a collective bargaining agreement providing for substantial salary increases for employees in the clerk and carrier grades.[6] As a result of the wage freeze imposed by President Nixon in August 1971, *see* Exec. Order No. 11615, 36 Fed. Reg. 15727 (1971), the Postal Service deferred implementation of a comparable increase for its management personnel until after the start of Phase II in November. When the increases were finally put into effect, the resulting salary differential between the most common supervisory position, PMS–15, and the most common rank-and-file grade, PS–5, was approximately 27%. App. at 67. Because the increases for management personnel exceeded the then applicable wage standard of 5.5%, the Postal Service's action was challenged before the Pay Board. The Postal Service defended the increases on the ground, *inter alia,* that in light of the substantial increases awarded rank-and-file employees through the collective bargaining process, the Postal Act's section 1004(a) mandate of "adequate and reasonable differential[s]" required a comparable increase for supervisory and other managerial personnel. App. at 152–68. By decision and order dated May 1972, the Pay Board approved the salary increases, noting the "tandem relationship" between the results of the collective bargaining and the salary increases due management personnel. App. at 102–03.

---

**5.** *See* App. at 46–47 (United States Postal Service Regional Instructions Re Salary & Benefit Increases for Managerial & Related Employees in Fiscal Year 1976) ("Salary Announcement").

**6.** The history of the 1971 salary increases and of the Postal Service's early reorganization ef-

forts can be found in App. at 141–68 (Statement in Support of Pay Increases for Certain Employees of the Postal Service, submitted by the Postal Service to the Pay Board, April 1972).

Meanwhile, the Postal Service proceeded apace on the reorganization of its compensation policies. It established a system of individual merit increases within grades based on consistent satisfactory performance, replacing an earlier system of automatic in-step increases based on seniority. It also launched the aforementioned Job Evaluation Program, the purpose of which was to produce a simplified and rational job-ranking structure incorporating changes in compensation levels believed necessary to comply with the comparability provision contained in section 1003(a) of the Postal Act. This Program led to the redesign of the Postal Service's classification system for management personnel, which converted some positions into higher grade levels to repair what was thought to be undercompensation in relation to comparable jobs in the private sector, and readjusted other positions downward to account for comparable overcompensation.

In July 1975 the Postal Service completed negotiations on a new collective bargaining agreement for the rank-and-file workers. The agreement provided for base annual salary increases at four different intervals over the term of the contract. It also provided for a cost-of-living adjustment ("COLA") in each full pay period after the release of the consumer price index for September and March of each year during the agreement's effective period. App. at 198–200.

In October 1975 the Postal Service announced salary increases for its employees not covered by the collective bargaining agreement. Pursuant to the Postal Act's requirement of direct participation by representatives of supervisory and other managerial personnel in the setting of compensation policies for those personnel,[7] this announcement had been preceded by a series of discussions between the Postal Service and the Associations, culminating in a conference between the Associations' leadership and the Postmaster General on October 8, 1975. The day after this conference, the Postal Service made its salary increase announcement, the immediate effect of which was to fold into the base annual salary of all non-bargaining unit employees, retroactive to July, a temporary COLA increase that they had been receiving. Future periodic COLA payments were discontinued. In addition to this general salary adjustment, the Postal Service announced that PMS schedule employees would receive salary increases ranging from $300 to $360 effective January 1976; that PES schedule employees in grades 23 and below would receive, retroactive to July 1975, a 3% increase, and, effective January 1976, an additional 2% increase; that the merit increase budget available to PES schedule employees in grades 24 and above would be increased 4%; and that NCD schedule postmasters in grades 12 and 17 would receive increases ranging from $125 to $300, retroactive to July 1975, with NCD postmasters in grades 12 and 15 receiving further increases of $150 and $175 respectively effective January 1976.[8] NCD schedule postmasters in grades 1 through 7 did not receive increases in addition to the general salary adjustment.

The salary differential resulting from these increases varies depending, among other things, on what positions are compared, on what date they are compared, and on whether the higher or lower steps within selected grades are used as a basis for comparison. It is not disputed, however, that the 1975 salary increases accomplished a decrease in the average differential between management and rank-and-file workers, and that, as of March 1977, the salary differential between the average worker holding the most common supervisory position of PMS–15 and the average worker holding the most common rank-and-file position of PS–5 was approximately 21%. App. at 501.

---

7. NAPUS and the Postmasters League are "recognized associations" entitled to represent postmasters in section 1004(b) consultations. The Supervisors hold the same status with respect to postal supervisors.

8. The data on these increases can be found· in App. at 42–49 (Salary Announcement).

### D

In November 1975 the Supervisors filed suit in the district court charging that the Postal Service's denial of future COLA payments and reduction of the salary differential violated section 1004(a) of the Postal Act. The Supervisors asserted jurisdiction based on 39 U.S.C. § 409,[9] 28 U.S.C. § 1339,[10] and the mandamus provisions of section 1361 of the Judicial Code.[11] Shortly thereafter, NAPUS and the Postmasters League also filed suit, restating the principal features of the Supervisors' complaint and alleging in addition that the Postal Service's compensation decisions were made in violation of section 1005(f) of the Postal Act[12] as well as the procedural requirements contained in section 1004(b) and certain agreements between the Postal Service and the Associations.[13] In addition to the jurisdictional bases offered by the Supervisors, NAPUS and the League cited the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Administrative Procedure Act, 5 U.S.C. §§ 702–705.

Consolidation and discovery ensued. The Postal Service filed a motion to dismiss or in the alternative for summary judgment, arguing that the court lacked subject matter jurisdiction and that the Postal Service's decisions constituted unreviewable administrative actions. The Associations responded with their own motion for summary judgment. On February 18, 1977 the district court, following a hearing on the cross-motions, orally announced its view that "it does not appear that the Postal Service has considered this differential [requirement] when they have raised [sic] the persons who are subject to collective bargaining." App. at 575. Six days later, the court incorporated this view in a formal order which stated that the Postal Service had "not considered the requirement for adequate and reasonable differentials as provided by the [Postal] Act." App. at 578. The order directed the Associations to "meet with the Postal Service and specify the differentials that they think should be provided." *Id.* The court added that the Postal Act "does not specify or necessarily require a differential of 25%," but that "[o]f necessity,

9. 39 U.S.C. § 409 (1976) provides:

(a) Except as provided in section 3628 of this title [relating to judicial review of postal rate decisions by the court of appeals], the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service.

10. 28 U.S.C. § 1339 (1976) provides:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service.

11. 28 U.S.C. § 1361 (1976) provides:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

12. 39 U.S.C. § 1005(f) (1976) provides:

Compensation, benefits, and other terms and conditions of employment in effect immediately prior to the effective date of this section, whether provided by statute or by rules and regulations of the former Post Office Department or the executive branch of the Government of the United States, shall continue to apply to officers and employees of the Postal Service, until changed by the Postal Service in accordance with this chapter [relating to the compensation of manage-

ment personnel] and chapter 12 of this title [relating to compensation of rank-and-file workers].

NAPUS and the Postmasters League charged that the 1975 salary increases brought about a change in the compensation and benefits of supervisory and other managerial personnel that was not in accordance with the provisions relating to the compensation of those personnel, specifically, § 1004. *See* n. 17 *infra.*

13. The agreements to which the complaint adverted were an outgrowth of a prior civil action described in *National Ass'n of Postal Supervisors v. Klassen,* Civ. No. 73–412 (D.D.C. filed Apr. 3, 1973). In *Klassen,* the Supervisors challenged the implementation of the Job Evaluation Program on the ground that the Postal Service had instituted the Program in violation of § 1004(b)'s direct participation requirement. The district court held in favor of the Postal Service. While the Supervisors' appeal was pending, the Postal Service negotiated an agreement with it outlining the procedures to be followed in complying with § 1004(b). Substantially similar agreements were thereafter negotiated with both NAPUS and the Postmasters League. A sample agreement may be found in Record II, vol. I, at 9. *See* pp. ——–—— of 195 U.S.App.D.C., pp. 438–439 of 602 F.2d *infra.*

there will have to be some upgrading of the salaries of the positions involved in this case." App. at 577–78.

Thereafter representatives of the Postal Service and the Associations met, but they were unable to reach an agreement. The parties subsequently moved for entry of final judgment: the Postal Service offered additional salary and merit increases for most of the employees effective 1978; the Associations asked for a lump sum retroactive payment as well as additional immediate salary increases for all supervisors and postmasters. On May 10, following argument on the pending motions, the district court announced from the bench that it rejected both the Postal Service's proposed 1978 increases and the Associations' request for retroactive payments. The court held, however, that the Postal Act required an immediate salary increase effecting an upward adjustment in the salary differential. Although the court said that it had no "authority to pick figures," it invited the parties into chambers "to work out the figures." App. at 601. On May 12, apparently on the basis of these consultations, the court issued its final judgment on the Associations' section 1004(a) counts, ordering the Postal Service to grant immediate salary increases of 6% to PES schedule employees in grades 17 through 30, 7% to all PMS schedule employees and to NCD schedule employees in grade 12, and 8% to NCD schedule employees in grades 15 and 17. The court rejected increases for NCD schedule postmasters in grades 1 through 7 "since these postmasters have no supervised employees." App. at 604.

The salary differential resulting from these increases is, on the average, approximately 24.7%. The penultimate paragraph of the district court's judgment provided: "It is contemplated that the 'adequate and reasonable differential in rates of pay between the clerk and carrier grades in the line work force and supervisory and other managerial personnel' which will result as of July 22, 1977 [the effective date of the court-ordered increases], shall be maintained." App. at 604 (quoting 39 U.S.C. 1004(a)). Consequently, the court's judgment obligates the Postal Service to provide a salary differential of over 24% in any future salary increase announcement.[14]

On May 31, 1977 the district court issued a final judgment on the remaining counts, dismissing as moot NAPUS and the Postmasters League's contention of procedural violations under section 1004(b) of the Postal Act.

## II

The Postal Service's arguments on appeal substantially repeat those addressed to the district court. Its threshold argument is that the court lacked the power to hear the suit. Alternatively, it claims that the court acted beyond its review authority in mandating specific salary increases and a fixed differential. The Postal Service contends that the legislative history of the Postal Act evinces a congressional intent to commit the establishment of the compensation and benefits of postal employees to the management of the new Postal Service. The Associations respond that the jurisdictional statutes—in particular 39 U.S.C. § 409 and 28 U.S.C. § 1339—together with section 1004(a)'s "adequate and reasonable differential" language indicate a congressional desire to create a binding and judicially-enforceable statutory requirement. They say that the Postal Service's past practices, including its 1971 salary increases and the defense of those increases before the Pay Board, demonstrate that the agency itself regarded section 1004(a)'s language as requiring a differential at least in excess of that resulting from the 1975 salary increases. Additionally, NAPUS and the Postmasters League assert that the district court erred in denying NCD postmasters in grades 1 through 7 any salary increases or differential protection. They reason that section 1004(a) prescribes the same "ade-

---

14. By order dated May 31, 1977 the district court stayed the effect of its judgment pending the outcome of this appeal. App. at 609.

quate and reasonable differential" for all "supervisory and other managerial personnel" regardless of whether those personnel actually supervise other employees.

On these jurisdiction and reviewability questions the district court said at one point that it lacked the "authority to pick figures." The effect of its judgment, however, was to do precisely that. We believe this was error.

### A

■ We need not labor long on the jurisdictional questions. The Associations collectively asserted five different statutory provisions, each of which, they claim, provides the district court with the power to hear the case. We can quickly dispose of two of the provisions to which the Associations refer us. It is now clear that the Administrative Procedure Act does not supply an independent basis for subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). It has long been settled that the same is true of the Declaratory Judgment Act. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *National Treasury Employees Union v. Nixon,* 160 U.S.App.D.C. 321, 350, 492 F.2d 587, 616 (1974).

■ We agree with the Associations, however, that the jurisdictional provision in 28 U.S.C. § 1339 provides a basis for hearing this action.[15] An inquiry into a court's jurisdiction to hear a suit is separate and distinct from consideration of whether the suit raises issues amenable to judicial resolution. *See Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *National Treasury Employees Union v. Campbell,* 191 U.S.App.D.C. 146, 152, 589 F.2d 669, 675 (1978); *Davis Associates, Inc. v. Secretary, Department of Housing & Urban Development,* 498 F.2d 385, 388 (1st Cir. 1974); C. Wright, *Federal Courts* 72 (3d ed. 1976). The former inquiry can result in a dismissal for want of jurisdiction; the latter calls for

a judgment on the merits. 28 U.S.C. § 1339 gives the district courts original jurisdiction over suits "arising under" statutes relating to the postal service. *See* n. 10 *supra.* We find that the Associations' complaints present nonfrivolous colorable claims under the Postal Act. That being sufficient for jurisdictional purposes, we accordingly hold that the district court correctly assumed subject matter jurisdiction over the controversy. This did not necessarily entitle the district court, however, to resolve the issues presented by the Associations' complaints in the manner it did.

### B

■ The existence of a jurisdiction-conferring statute does not alone create a right of action for judicial review of agency action. Such a statute triggers the well-established presumption favoring judicial oversight of administrative activities, *see Barlow v. Collins,* 397 U.S. 159, 165, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Harper v. Levi,* 171 U.S.App.D.C. 321, 335, 520 F.2d 53, 67 (1975), but that presumption operates differently depending on a judicial determination of congressional intent, the functional needs of the agency for flexibility and discretion, and the capacity of the courts to resolve the issues presented them. Hence the presumption can be overcome by evidence of a legislative intent to foreclose judicial intervention, *see National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 463–65, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *Brotherhood of Railway & Steamship Clerks v. Association for the Benefit of Non-Contract Employees,* 380 U.S. 650, 669, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965); *Ford v. United States,* 230 F.2d 533, 534 (5th Cir. 1956) (per curiam), or a finding that the issues involved are unsuitable for judicial determination owing to the character of the discretion delegated to the administrative agency, *see Ludecke v. Watkins,* 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948); *United*

---

**15.** Because we hold that 28 U.S.C. § 1339, n. 10, *supra,* provides jurisdiction over this action, we need not consider whether the Associations' other suggestions, 39 U.S.C. § 409, *see* n. 9 *supra,* and 28 U.S.C. § 1361, *see* n. 11 *supra,* could also supply jurisdiction.

*States v. George S. Bush & Co.,* 310 U.S. 371, 380, 60 S.Ct. 944, 84 L.Ed. 1259 (1940); *Payson v. Franke,* 108 U.S.App.D.C. 368, 371, 282 F.2d 851, 854 (1960), *cert. denied,* 365 U.S. 815, 81 S.Ct. 696, 5 L.Ed.2d 694 (1961). Nonreviewability is not to be casually inferred. The case against judicial scrutiny of an agency's exercise of discretion must be a compelling one. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 156–57, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Rusk v. Cort,* 369 U.S. 367, 380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). Yet assuming the absence of a constitutionally-based claim, if Congress clearly intended to preclude or restrict review, if judicial interference would imperil the policies underlying the lawmakers' decision to delegate the discretion, if the nature of the administrative discretion is such that the conventional tools of judicial analysis are unsuited to an examination of its exercise, then a court is not at liberty to disregard those limitations and proceed to substitute its own judgment for that of the administrative agency.

The Associations' complaints do not raise issues of constitutional dimension. The crucial inquiry, then, is whether the Postal Act's statutory scheme and the history of its evolution compel judicial restraint in the present circumstances. And in conducting that inquiry, courts must be careful not to transform a congressional intent to restrict the scope of judicial review into a finding that no review is appropriate at all.

Wholesale reform of the Nation's postal system received its initial impetus in the late 1960's, when then Postmaster General Lawrence O'Brien recommended that his job be abolished and his department reorganized along the lines of a private enterprise. A presidential commission appointed to examine that recommendation eventually adopted it, and several bills were introduced in Congress to implement it.[16] Before these proposals could be considered, postal employees staged a nation-wide work stoppage

in March 1970, the first of its kind in Post Office history. The work stoppage dramatized the need for significant reforms of the Post Office's compensation and other managerial policies, and as a result, proposals for complete reorganization of the Cabinet department assumed a new urgency. In April, a new and more comprehensive reform package was introduced in the House as H.R. 17070. 116 Cong.Rec. 12130 (1970). A month later, the House Committee on Post Office and Civil Service favorably reported the bill with amendments. The Report accompanying the recommendation noted that the old postal department operated on policies that were "outmoded, unnecessary, and inconsistent with modern management and business practices." H.R. Rep.No. 1104, 91st Cong., 2d Sess. 2 (1970), U.S.Code Cong. & Admin.News 1970, p. 3650. The Committee added:

> Top management must be given authority, consistent with its responsibilities, to provide an efficient and economical postal system. Postal management has been severely and unjustly hampered in its efforts to administer the Department in a businesslike way.

*Id.* at 5, U.S.Code Cong. & Admin.News 1970 at p. 3653.

H.R. 17070, though stopping short of creating a completely independent government corporation to run the postal system, proposed the establishment of a new "businesslike" agency. The Post Office had always had the obligation to provide an efficiency-conscious nationwide postal delivery system, but it had never had the power to control the costs of that system; Congress alone set postal rates and the wages of postal employees. H.R. 17070 was designed to afford the new postal agency with the control over revenue and costs commensurate with its predecessor's responsibility to provide an efficient postal delivery system.

The Report accompanying the substantially similar Senate version of H.R. 17070 echoed this theme. Observing the "obvious

---

**16.** The history of the Postal Act is traced in H.R.Rep.No. 1104, 91st Cong., 2d Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 3649

and in 116 Cong.Rec. 21708 (1970) (remarks of Sen. McGee).

requirement that postal management must now be given the unfettered authority and freedom it has been denied for years," the Report explained that reorganization would correct past deficiencies by providing for:

> (1) continuity of management, (2) the authority to control postal revenue, (3) the authority to control costs, and (4) the authority to acquire funds outside the budget . . . .

S.Rep.No. 912, 91st Cong., 2nd Sess. 2–3 (1970).

This same theme was also prominently mentioned during the floor debates in both the House and the Senate. Rep. Dulski, chairman of the House Committee on Post Office and Civil Service and the sponsor of H.R. 17070, cited "finance as the most critical postal problem," 116 Cong.Rec. 19845 (1970), and said that his proposal would give the new postal management "the authority to operate the postal service efficiently and economically, with freedom of financing," *id.* at 19846. Another supporter of the bill commented:

> The principal failure of the present system is one of management. It is just not reasonable to expect a manager of the Post Office Department to succeed in his task when he has little, if any, control over workload, revenue, pay rates, conditions of service, physical facilities, and many other important matters. I do not think substantial improvement in the postal system can be expected until postal managers are given authority and the freedom of action they need to make necessary changes.

*Id.* at 20491–92 (remarks of Rep. Hamilton).

Perhaps the most illuminating comments were made by Rep. Dulski's Senate counterpart, Sen. McGee, in introducing the Senate version of H.R. 17070. Responding to critics of the powers to be delegated to the new agency, who argued that other government agencies performed capably while subject to "applicable" laws, Sen. McGee remarked:

> Delivering mail is imply not in the same category of policymaking and program-development as foreign policy, national defense, housing, highway construction, or health and education assistance to State and local governments. It is an essential, business-oriented service. The committee has no intention of establishing any postal system which does not have a direct and continuing responsibility to the people and to Congress, but we do believe that its role can be fulfilled with a greater degree of efficiency if it is removed from the ordinary channels, administrative controls, and legislative restrictions of other agencies in the executive branch.

*Id.* at 21709. Sen. McGee said that the delegation of broad powers to the new agency's Board of Governors was designed "to insure independence for operating management." An additional guarantee of independence was:

> Except as specified in the bill, all laws relating to public works, contracts, employment, appropriations, budgeting, and any other laws governing agency operations are made inapplicable to the Post Office.

*Id.* This independence would permit the new Postal Service to control not only revenues, but costs, 80% of which were attributable to wages, *id.* According to Sen. McGee, the Post Office's inability to monitor expenditures

> is a positive, ever present weakness in the system of management . . . .. For a Postmaster General who knows that he cannot control his costs, that nothing he does has a binding effect on his costs, will have a very difficult time developing and maintaining the kind of management attitudes for successful operations. His efforts to achieve effective operational control, however noble and sustained, can be undercut at a moment's notice by the enactment of programs which, however well guided or misguided, may alter his best plans for economical, effective operations.

*Id.* at 21710.

█ The foregoing indicates, in our judgment that Congress intended to vest the Postal Service with broad discretion in setting compensation policies and to limit judi-

cial oversight of the Postal Service's exercise of that discretion. Judicial regulation of the Postal Service's compensation decisions can only undermine the legislative determination that the new postal management must have the freedom given by the statute to control costs and manage the new agency in a manner consistent with its views of what is the economical and efficient thing to do. This court is in no position to assess and to weigh the numerous and sundry considerations the Postal Service must address in fulfilling its statutory duty to classify and fix the compensation and benefits of its employees.

Our holding that the Postal Service has broad discretion in setting compensation levels for supervisory and other managerial employees is consistent with the traditional reluctance of courts to scrutinize lawful agency decisions on internal management matters. *See, e.g., National Treasury Employees Union v. Campbell, supra,* 589 F.2d at 679; *Wheelabrator Corp. v. Chaffee,* 147 U.S.App.D.C. 238, 241, 455 F.2d 1306, 1309 (1971); *cf. Kuhl v. Hampton,* 451 F.2d 340, 342 (8th Cir. 1971) (per curiam); *Leber v. Canal Zone Central Labor Union & Metal Trades Council,* 383 F.2d 110, 118 (5th Cir. 1967), *cert. denied,* 389 U.S. 1046, 88 S.Ct. 769, 19 L.Ed.2d 838 (1968). This deference derives from two well-considered and complementary principles: that administrative agencies must be free from undue encumbrances to perform wholly managerial functions assigned to them by Congress, and that courts are ill-equipped to run the administrative agencies of government. *See generally* K.C. Davis, *Administrative Law* § 28.16 at 82 (1958). That deference is appropriate here.

### C

That the Postal Service has broad discretion in setting compensation levels does not mean, however, that its decisions are entirely insulated from judicial surveillance. Courts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion. Reviewability and the scope of review are two separate questions. The history of the Postal Act indicates that Congress contemplated a very restricted judicial role in the Postal Service's compensation decisions. It does not present the kind of evidence necessary to foreclose review altogether.

The scope of review in this case and the resulting judicial task mimic that appropriate in mandamus actions. Chief Justice Taft's opinion for the Court in *Work v. United States ex rel. Rives,* 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561 (1925), explained the boundaries of judicial involvement in that context in this way:

> [Mandamus] can not be used to compel or control a duty in the discharge of which by law [an administrative officer] is given discretion. The duty may be discretionary within limits. He can not transgress those limits, and if he does so, he may be controlled by injunction or mandamus to keep within them. The power of the court to intervene, if at all, thus depends upon what statutory discretion he has. . . . [The] extent [of administrative discretion] and the scope of judicial action in limiting it depend upon a proper interpretation of the particular statute and the congressional purpose.

*Id.* at 177–78, 45 S.Ct. at 252–253. Pursuing this line of inquiry does not import into this nonstatutory review proceeding the now discredited discretionary/ministerial dichotomy that has occasionally plagued mandamus analysis. Rather it involves a straightforward question of statutory interpretation. The judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within that authority. In this as in other settings, courts owe a measure of deference to the agency's own construction of its organic statute, *see Train v. Natural Resources Defense Council,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), but the ultimate responsibility for determining the

bounds of administrative discretion is judicial, *see National Treasury Employees Union v. Nixon, supra,* 492 F.2d at 606.

Viewed from this perspective, the Associations' complaints, considered as one, claim that the Postal Service exceeded its discretion in two respects. The Associations premise their first claim on the "adequate and reasonable differential" requirement of section 1004(a). On their reading of the statute, this section obligates the Postal Service to increase the salaries of *all* supervisory and other managerial personnel as much or more than the increases granted to the rank-and-file workers. They appear to contend that this requires the Postal Service to maintain a salary differential of 25% or more. The Associations urge that in enacting section 1004(a) Congress intended such a differential to be binding on the agency, and that the Postal Service initially regarded itself as so bound. The Associations premise their second claim on the "participate directly" requirement of section 1004(b). In this connection they concede that their representatives met with representatives of the Postal Service regarding the proposed 1975 salary increases, but the Associations argue that section 1004(b)'s requirement of direct participation in the Postal Service's compensation decisions means that the consultations must be conducted "genuinely, meaningfully, and in good faith," which they say did not happen. Using, in Chief Justice Taft's phrase, "the particular statute and the congressional purpose" as our guide, we discuss these contentions in turn.[17]

1. Section 1004(a)

The greatest flaw in the Associations' interpretation of section 1004(a) is that the text of the Postal Act does not support it. Section 1004(a) does not set a fixed differential of 25% or any other figure; it does not mandate that management personnel receive increases as much or more than those given rank-and-file workers

through the collective bargaining process; it does not hold the agency to an express formula for computing the salary differential; it does not define a precise relationship between the compensation received by one class of postal employees and that received by another. Any one of those options was within the power and ability of Congress to legislate. Congress chose instead to leave the precise differential to the discretion of the agency, mandating only that the differential at any given time be "adequate and reasonable." We are not free to reverse that decision. That is, we cannot through statutory construction create more precise standards and rights than Congress elected to create.

Indeed, not only did Congress opt to grant the Postal Service discretion in setting the differential, but it also expressly rejected proposals that would have limited that discretion by imposing a differential formula on the new agency. Contrary to the Associations' claims, the legislative history of the Postal Act unmistakably indicates that Congress did not want to bind the Postal Service to fixed differentials to be maintained *ad infinitum.* Certainly this is evident from the congressional concern that the new postal management have direct and continuing control of costs. *See* Part IIB *supra.* It is also evident from the legislative history of section 1004(a).

The original Senate version of the Postal Act did not contain a differential provision at all, though the Report accompanying that version indicates that the Senate Committee considered the issue. After noting the genuine morale problems occasioned by often inadequate and sometimes non-existent differentials in pay rates between management and rank-and-file personnel, the Senate Committee commented:

The committee, not wishing to impose a binding statutory requirement concerning [differentials] upon the Board of Governors, nevertheless states its views that

17. NAPUS and the League also asserted that the Postal Service violated § 1005(f) of the Postal Act. *See* n. 12 *supra.* We need not separately consider this assertion, however, for

if the Postal Service met its obligations under § 1004, then *a fortiori* it complied with the provisions of § 1005(f).

rectification of [past salary] imbalance[s] ought to be a matter of early concern to the new managers of the postal service. S.Rep.No. 912, 91st Cong., 2d Sess. 7 (1970).[18]

The House Committee version went to the opposite extreme, writing a differential formula into the statute:

It shall be the policy of the Postal Service to provide adequate and reasonable differentials in rates of pay between employees in the clerk and carrier grades in the line work force and supervisory and managerial employees. The Postal Service shall, in carrying out this policy, fix salary levels for the type of first line supervisors now in PFS 7 at a level which is not less than a level approximately as much higher as their rates of pay now exceed those in present grade PFS 5. There shall be appropriate and reasonable differentials between PFS 7 and 8 and between all higher grades similar to those in effect on the day immediately before the date of enactment of this section.

App. at 538. During the floor debates, an amendment was introduced proposing, *inter alia,* the deletion of all but the first sentence of this provision. 116 Cong.Rec. 20440 (1970).[19] There was very little said in the ensuing debate about the advantages and disadvantages of a fixed differential. Only one participant, a supporter of the amendment, explicitly addressed the issue:

The [Committee version of H.R. 17070] just goes too far, in my opinion, in extending the supervisors things they do not need, and perhaps should not have, and certainly automatically by law, if they are a part of the management team—and they must be if we are to gain efficiency in the postal service, they have got to be brought into the management responsibility and really treated as part of the management. *If they are going to participate in negotiations and discussions as a part of management then they should not be, in my opinion, guaranteed by law pay differentials for them, it seems to me, gives a built-in conflict of interest.* If they know that whatever pay increases and other benefits the rank

---

18. The Associations' claim that Congress intended a differential of 25% seeks support in the Senate Report's recitation of the testimony of a former Assistant Postmaster General who suggested a minimum differential of 25%. The recounting of that testimony, however, is immediately followed by the Senate Committee's ultimate recommendation quoted above. Moreover, as we note, the Senate version of H.R. 17070 did not include any specific, textual differential guarantee.

19. The text of the amendment is not immediately clear from the record of proceedings, and this created some confusion in the district court. *See* Record II, vol. III, at 37 (Memorandum of Points and Authorities in Support of Plaintiff's Cross-Motion for Summary Judgment & and in Opposition to Defendant's Motion for Summary Judgment) ("Associations' Memorandum"). The fixed differential requirement appeared on lines 6–13 on page 178 of the House Committee version of H.R. 17070. App. at 538. Shortly after debate on this chapter of the Postal Act began, Rep. Purcell offered an amendment that was primarily directed at the area wage policies to be followed by the Postal Service in carrying out the comparability provisions. 116 Cong.Rec. 20432 (1970). Apparently as a result of a typographical error, *see id.* at 20434 (remarks of Rep. Dulski), the Purcell amendment would have cut off part of the first

sentence of the provision quoted immediately above while retaining the fixed differential provision. Rep. Corbett offered an amendment to the Purcell amendment the effect of which was to confine the latter to the area wage provisions and retain the House Committee differential provisions. *Id.* at 20434. Rep. Purcell accepted the Corbett amendment. *Id.* Before the Purcell amendment as amended could be considered, Rep. Gibbons offered a substitute amendment that was also directed at the area wage policies and also did not affect the fixed differential requirement. *Id.* at 20434. Evidently believing that the Gibbons amendment did affect the fixed differential provision, Rep. Thompson offered an amendment to do "to the Gibbons amendment the same that the Corbett amendment did to the Purcell amendment." *Id.* at 20438. Though gratuitous, Rep. Gibbons accepted the Thompson amendment. *Id.* The Gibbons amendment was then defeated. *Id.* at 20440. Immediately thereafter, the House adopted the Purcell amendment. *Id.* At this point, the fixed differential requirement was still in H.R. 17070. It was then that Rep. Derwinski offered an amendment to strike, among other things, that portion of the House Committee version requiring a fixed differential. *Id.*

and file through their organizations are going to get, it seems to me that it would be very difficult to be completely open-minded and impartial—and I know they would want to be.

*Id.* at 20443 (remarks of Rep. Henderson) (Emphasis added). The amendment to delete the fixed differential prevailed in the House. *Id.* at 20445. The Conference Committee adopted the House version. H.R. Rep.No. 1363, 91st Cong., 2d Sess. 82–83 (1970) (Conference Report).

Thus one House of Congress, wishing to avoid the imposition of a binding statutory requirement on the new agency, did not propose a differential guarantee at all. The other House adopted the differential guarantee that ultimately prevailed, but specifically rejected making that guarantee into a fixed formula or figure. As we said, it is clear that the Associations are not entitled to win in this court what they could not win in the halls of Congress.[20]

Of course, the fact that Congress refused to establish a *fixed* differential does not mean that the differential guarantee is a meaningless, empty promise, one which the Postal Service can ignore at will. The Postal Act does require *some* differential, and requires that that differential be adequate and reasonable.

We believe that the adequacy and the reasonableness of the differential—and therefore the Postal Service's compliance with its duty under section 1004(a)—must be measured in light of the other standards Congress included in the Postal Act to guide the Postal Service's compensation decisions. Section 1004(a)'s differential requirement cannot be read in isolation, but instead draws its meaning from the context in which it appears. Under sections 1003 and 1004 of the Postal Act, the Postal Service must consider a number of factors in setting the compensation and benefits of its supervisory and other managerial person-

nel, including the compensation paid for comparable work in the private sector, the need to attract and retain qualified and capable management personnel, and the importance of promoting the leadership status of those personnel vis-a-vis the rank-and-file workers they supervise. Together with the differential requirement, moreover, these factors must be considered with respect to the Postal Service's overall responsibility, articulated in 39 U.S.C. § 101(a), of providing "prompt, reliable, and efficient" postal services.

Some factors, like the differential requirement, may at times conflict with others, like the comparability standard. But it is for the Postal Service and the Postal Service alone to resolve those conflicts. This necessarily means that the differential will vary with time and circumstance, and that the Postal Service is not obliged to provide the same salary differential year after year or to all its management personnel regardless of the work those personnel perform. If in establishing salary levels for management personnel the Postal Service considers each of these factors and arrives at a good faith judgment regarding a differential that is adequate and reasonable in light of these factors, then it has performed its duty under section 1004 and judicial inquiry is at an end. Thus a court can compel the Postal Service to consider and fulfill the differential requirement, but it cannot substitute its own judgment of what is adequate and reasonable for that of the Postal Service. If the Associations are dissatisfied and seek additional guarantees, they must carry their plea to the legislature.

Our construction of section 1004 is not inconsistent with the Postal Service's previous compensation practices and policies. The Postal Service's 1971 salary increases and its defense of those increases before the Pay Board, which the Associations earlier termed the "key" to this proceeding,[21]

---

**20.** It is noteworthy that neither the fixed differential requirement contained in the House Committee version of H.R. 17070 nor the salary increase included in the Postal Act produced a differential of 25%.

**21.** *See* Record II, vol. III, at 37 (Associations' Memorandum).

merely reflect, in our view, the Postal Service's judgment of what was adequate and reasonable in that year in light of all the relevant factors. The 1971 increases were the new postal agency's first compensation decision affecting management personnel. They were designed, in large measure, to remedy the existing situation in which some management personnel were being paid significantly less than the employees they were managing. It was inevitable, once the new agency had a full opportunity to assess its organizational, recruitment, classification, and compensation programs and to streamline its overall operations, that some adjustment in the differential would be forthcoming.

2. Section 1004(b)

▆▆▆ Section 1004(b) provides that representatives of supervisory and other managerial personnel are entitled to participate directly in the development of Postal Service compensation programs and policies. We agree with the Associations that this means the Postal Service must discuss its proposed compensation policies with the Associations before those policies go into effect, and we further agree that such discussions must be conducted in a meaningful, good faith manner. Under no circumstances, however, does this mean that the Postal Service can be forced to accept the Associations' proposals on compensation policies or even be compelled to negotiate those policies with the Associations. The text of the Postal Act and the history of section 1004(b) make this point clear and unambiguous.

We have observed that chapter 12 of the Postal Act expressly excludes supervisory and other managerial personnel from representation in any collective bargaining unit. *See* 39 U.S.C. § 1202(1) (1976). The "participate directly" language of section 1004(b) derives from the Senate Committee version of H.R. 17070; its Report explained:

The committee has weighed very carefully the difference between "participation" and "consultation" in the development of employment programs for supervisory and administrative employees. For employees who are truly part of management of the Government, the argument that consultation is all that is either necessary or desirable may have some validity; but employees in the lower levels of supervision or administration in the postal service are not sufficiently separated from the nature of employment of those whom they supervise to justify withholding from them some degree of active representation in the development of employment programs which affect and, in fact, control their livelihood. . . *The committee does not recommend a system of collective bargaining for supervisory personnel, postmasters, or administrative employees in headquarters or regional offices of the postal service, but we do define "participation" as meaning precisely that—to have a share in planning and developing programs.*

S. Rep. No. 912, 91st Cong., 2d Sess. 6–7 (1970) (emphasis added). Hence, though the Senate was concerned that supervisory and other managerial personnel receive a "share" in the development of programs, it did not bind the Postal Service to any process whereby the agency could be compelled to adopt or bargain for a particular program.

The House went further. The House Committee version of H.R. 17070 would have authorized representatives of management personnel to "act for and make agreements covering" all supervisory and other managerial personnel. App. at 540. It also provided for an arbitration process in the event the parties failed to reach an agreement, the results of which the Postmaster General had to adopt unless he supplied Congress with reasons why the results were "contrary to the efficiency and good operation of the Postal Service." App. at 541. During the House debate, an amendment was introduced reshaping these provisions along the lines of the Senate version.[22] The sponsor of this amendment explained:

---

22. This was the same amendment that proposed elimination of the fixed differential requirement in the House Committee version of H.R. 17070. *See* n. 19 *supra* & accompanying text.

[T]his amendment corrects a very serious mistake in the bill as reported out of committee. [The Committee version] come[s] very close to requiring collective bargaining, in effect, between postal supervisors on the one hand and top management of the postal service on the other. Such a requirement flies in the face of almost all labor relations experience and judgement [*sic*] in the non-Government sector. . . . It would constitute a major step backwards from Executive Order 11491, which has delineated supervisors as part of the management and treats them as such. But worst of all, it contradicts and might even foredoom to failure what is perhaps the most important single purpose of this historic postal reform legislation—that is, to provide for truly effective management in the postal service. If the postal service is to be managed well, it must be understood by all concerned that supervisors are a highly important—in some ways the most important—part of effective management. . . . It would be seriously if not fatally damaging to this concept to require the postal service to negotiate what would amount to a collective bargaining agreement with a supervisors' organization because the negotiation process would tend to polarize the interests of the supervisors and those of the higher echelons, instead of bringing them together.

116 Cong.Rec. 20440–41 (1970) (remarks of Rep. Derwinski). The amendment prevailed. *Id.* at 20445. The slight differences between the Senate and House versions were resolved in Conference, the final language closely resembling the Senate's original direct participation mandate. The Conference Committee believed it necessary to caution, however:

Nothing contained in the House bill or the Senate amendment provided for, and nothing in the conference substitute permits, or is intended to permit, the establishment of a collective bargaining system for any personnel who are not within a collective bargaining unit. Neither the provisions relating to supervisory and other managerial organizations nor any other provision in the conference substitute establish any such collective bargaining system or grants any such organization or personnel the right to dictate policy or veto any decision reached by the Postal Service.

H.R.Rep.No. 1363, 91st Cong., 2d Sess. 83 (1970) (Conference Report).

This caveat is very precise in its repudiation of any compulsory mechanism for resolving disputes between the Postal Service and its management personnel. The reason for the concern seems clear: Congress did not want to create a setting in which top management could be pitted against lower level management; instead, it envisioned a system that could bring together all levels of management, with the top echelon dependent on the lower level to assist efforts at improved service and the lower levels correspondingly dependent on the top echelon for the rewards for that assistance. However unrealistically idyllic that vision may seem after over three years of contentious litigation, it is the "congressional purpose" that must govern our approach to this statute.

While these pieces of legislative history tell us a great deal about what section 1004(b) does not require, they do little to facilitate understanding of what the "participate directly" language commands. It appears that by participation Congress meant something more than consultation but less than negotiation. Consultation denotes an advisory process in which the advisee plays a passive role and the advisor's input can be rejected or accepted at will; the ultimate decision, which is the advisee's alone, is only coincidentally a product of the process. Negotiation, by contrast, suggests a bargaining process in which both parties play active roles and the suggestions of each can be rejected or accepted in whole or in part by the other only at the hazard of not reaching final agreement; the ultimate decision, *i.e.,* an agreement, is necessarily a

product of the process.[23] It may be that participation—or the right "to share" as Webster's and the Senate unhelpfully call it [24]—is a hybrid of these two processes, combining the noncompulsory features of consultation with the good faith requirements of negotiation. On this analysis, direct participation involves both parties playing active roles, accepting or rejecting proposals only for *bona fide* reasons, but with the ultimate decision, *i. e.,* the final resolution of conflicting legitimate rationales, left to one party, in this case, the agency. This analysis comports with the dual congressional desire to avoid compelling the Postal Service to engage in a process that could bind the agency to a compensation decision it views as contrary to the goals of efficiency and economy and yet to ensure organizations like the Associations with a meaningful role in the formulation of compensation decisions.

This is not the first litigation to explore the meaning of section 1004(b). In 1973 the Supervisors challenged the implementation of the Job Evaluation Program on the ground that the Postal Service had not complied with the statute. It was not disputed that in a series of meetings that began shortly after the Job Evaluation Program got under way the Postal Service had advised the Supervisors (as well as NAPUS and the Postmasters League) of the purpose and anticipated operation of the Program, and kept those Associations informed of the Program's progress. The Associations had the opportunity through these meetings to comment upon and criticize the Program's findings and conclusions. In an unpublished memorandum and order, *National Association of Postal Supervisors v. Klassen,* Civ. No. 73–412 (D.D.C. decided Apr. 3, 1973), District Judge Gasch held that the Postal Service had met its obligations under section 1004(b). Judge Gasch said that the Postal Service's duty

is satisfied . . . when it supplies information on the program [relating to supervisory and other managerial personnel], and provides an opportunity for discussion, with a concomitant exchange of ideas. It is not necessary that the organizations covered by § 1004(b) be involved in planning and development at the inception of each such program, so long as they are afforded reasonable opportunity to analyze, understand and criticize its features and have their recommendations regarding any desired changes given consideration.

Op. at 9.

While the Supervisors' appeal of Judge Gasch's order was still pending, the Postal Service negotiated an agreement with the Supervisors outlining the procedures to be followed in complying with section 1004(b). Shortly afterwards, the appeal having been dismissed, the Postal Service entered into substantially identical agreements with both NAPUS and the Postmasters League.

The NAPUS agreement is part of the record in this case. *See* n. 13 *supra.* The agreement provides, among other things, for monthly meetings between the Postal Service and NAPUS to discuss proposed programs and policies affecting supervisory and other managerial personnel. With respect to the direct participation requirement, the agreement, which by its terms applies to compensation decisions, calls for the Postal Service to give NAPUS advance notice of anticipated programs and policies and an opportunity to make recommendations regarding same. The Postal Service agreed to give "full and fair consideration" to these recommendations. The agreement continues:

Prior to making any determination to implement a program the [Postal Service] will provide to the NAPUS the proposed determination, together with all material information upon which such proposed determination is based, and any such pro-

---

**23.** The dictionary defines "to consult" as "to seek the opinion or advice of another." Webster's New International Dictionary 573 (2d ed. 1959). "To negotiate" is "to hold intercourse

or to treat with a view to coming to terms upon some matter." *Id.* at 1638.

**24.** *Id.* at 1782; S.Rep.No. 912, 91st Cong., 2d Sess. 7 (1970).

posed directives, regulations, or procedures to be used to implement the determination. Such material will be accompanied by an explanation of [the Postal Service's] tentative decisions. To the extent that the tentative decisions are contrary to any recommendations of the NAPUS, the [Postal Service] shall inform the NAPUS of the reasons for its rejection of such recommendations. Unless operational requirements make it unfeasible, the foregoing materials will be provided to the NAPUS far enough in advance (normally thirty days) of the final determination to allow NAPUS to review materials and formulate and make recommendations regarding them. At such time as the [Postal Service] arrives at a final decision to implement a program, it shall provide to the NAPUS a copy of all implementing directives, procedures or regulations prior to their general promulgation. The NAPUS shall be informed of the reasons for rejecting any recommendations to the extent that such reasons have not been earlier provided.

■ The salient features of this agreement bind the Postal Service to provide the Associations with (1) advance notice of proposed decisionmaking; (2) the materials being used in that decision; (3) an opportunity to make recommendations on the proposals; (4) full and fair consideration of those recommendations; (5) reasons for rejecting the recommendations; and (6) advance notice of any final decision. In our judgment, these features are consistent with Judge Gasch's useful construction of section 1004(b) and with our own understanding of the meaning of direct participation. They represent, moreover, a nearly contemporaneous interpretation of section 1004(b) by the Postal Service. In these circumstances, it is appropriate to invoke the principle that an agency is entitled to deference in the construction of its governing statute. *See Zuber v. Allen,* 396 U.S. 168, 192–93, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *American Power & Light Co. v. SEC,* 329 U.S. 90, 112–14, 67 S.Ct. 133, 91 L.Ed. 103 (1946). Accordingly, we hold that if the Postal Service gives the Associations an opportunity to analyze and criticize proposed compensation decisions and the materials on which those decisions are based, and then supplies the Associations with reasons for rejecting any criticisms in advance of a final decision, then the Postal Service has met its statutory obligations under section 1004(b) and the judicial function is at an end.

**D**

Having identified the limits on the Postal Service's discretion in section 1004 our only remaining chore is to determine whether or not the agency has strayed beyond those limits in this case.

■ On the section 1004(a) claim, the district court said that the Postal Service had "not considered" its obligation to provide adequate and reasonable differentials in rates of pay between management personnel and the rank-and-file workers. The court also held that the Postal Service did not have to provide NCD postmasters in grades 1 through 7 with the same differential given to other supervisory and managerial personnel. We agree with the district court that the Postal Service has the discretion to set different differentials for those employees who actually supervise workers and those who do not. We can find no basis in the record, however, for the district court's view that the Postal Service failed to consider the differential requirement of section 1004(a). As we have said, the Postal Service was not obliged to consider a differential requirement of 25% or any other set figure, but only to consider what *it* believed was an adequate and reasonable differential in light of all the factors it must take into account. At the same time, we are unable to say in the posture of this case that the Postal Service indeed lawfully exercised its discretion under section 1004(a). The largely conclusory affidavit submitted in support of the Postal Service's motion for summary judgment explains how the Postal Service goes about setting the compensation and benefits of its em-

ployees, but it does not say what the Postal Service *did* in setting the compensation and benefits of its employees in 1975.

Most of the affidavit does not deal with the question: the first sixteen paragraphs are a chronological description of the meetings held in 1975 between representatives of the Postal Service and the Associations; the last nine paragraphs consist of a rebuttal to an article that appeared in the Supervisors' official publication. Only paragraphs 17 through 28 purport to relate directly to the Postal Service's 1975 compensation decisions. Five of these paragraphs do no more than describe the Postal Service's salary schedules. The rest of the paragraphs outline the general policy considerations used by the Postal Service in making compensation decisions, but they do little to enlighten us on how such considerations were applied to the Postal Service's 1975 compensation decisions. For example, the affidavit states:

19. The Postal Service establishes the salaries of its supervisory and other managerial personnel at such a level to provide "adequate and reasonable" salary differentials between them and the employees under their supervision. In doing this, the Postal Service considers a broad range of factors, such as the traditional postal service differentials, private sector differentials, and the degree of supervisory and managerial responsibility granted to specific positions.

Conspicuously absent from the affidavit is data explaining what this "broad range of factors" indicated when the Postal Service undertook to set compensation levels in 1975. Nor does the affidavit reveal why, relying on such factors, the Postal Service arrived at the decisions it did. Similarly, another paragraph avers:

18. The Postal Service also seeks to establish levels of compensation for its supervisory and managerial personnel that will assure the attraction and retention of qualified and capable supervisors and managers. Statistics are available supporting the conclusion that the Postal Service has achieved this goal.

This paragraph proceeds to recount some statistics claiming to demonstrate that few Postal Service employees voluntarily resign from the Postal Service. The affidavit does not explain how these statistics, and other "available" but unrevealed statistics, were relied upon to arrive at the 1975 compensation decisions. Nowhere does the affidavit report how the Postal Service reconciled statutory provisions, nor does it set out the precise basis for 1975 average salary differential of 21%. Indeed, there is no way of knowing from the affidavit whether all supervisory and other managerial personnel actually receive some kind of differential, or whether the Postal Service, in the exercise of its discretion, arrived at salary differentials for 1975 that it believes are "adequate and reasonable."

Stated differently, it is not sufficient merely to recite a statutory directive and to avow in the broadest terms the agency's continuing devotion to that directive. Confronted with the Associations' complaints, the Postal Service must demonstrate that the compensation decisions which were reflected in the compensation schedules promulgated *in 1975* complied with the requirements of the Postal Act relating to the compensation and benefits of supervisory and other managerial personnel. As we noted in Part IIC, *supra,* those provisions require that the Postal Service set its compensation levels by reference, *inter alia,* to the compensation paid for comparable work in the private sectors of the economy, to the need to attract qualified management personnel, to a differential in rates of pay between management and rank-and-file workers, to the importance of promoting the leadership status of management personnel, and to its general responsibility to provide efficient postal delivery service. This listing does not exhaust the range of possible considerations that the Postal Service may weigh in setting compensation levels for management personnel, for the agency is entitled to assess other factors that are not inconsistent with the Postal Act's requirements. But for the Postal Service to prevail on remand, its submissions must at the very least show that in 1975 it

considered all the factors as directed by the Postal Act and that it applied such factors in establishing adequate and reasonable salary differentials for all supervisory and other managerial personnel. This showing necessarily requires the Postal Service to set out the factors it considered in 1975, to explain the relationship between those factors and the statutory requirements, to describe what those factors indicated in 1975, to reveal why (and how) it resolved the tensions, if any, among the various factors as it did, and to relate why the salary differentials resulting from these calculations are adequate and reasonable in light of the factors.

We are therefore compelled to remand the case to the district court for further proceedings on this issue. We reiterate that the district court is not entitled to usurp the Postal Service's determination of what is adequate and reasonable, but only to ensure that the Postal Service fairly considered the factors it is obligated to weigh under the Postal Act.

On the section 1004(b) claim, we have no difficulty holding that the Postal Service met its obligation to afford the Associations with an opportunity to understand, analyze, and criticize the Postal Service's compensation proposals. The Postal Service affidavit sets out in some detail the meetings conducted pursuant to section 1004(b), the Association's recommendations on those proposals, and the Postal Service's response to those recommendations. The facts there stated are sufficient to demonstrate compliance with the statutory mandate.

### III

In sum, although the district court had the authority to hear the case, and while the language of the Postal Act admits to some very restricted judicial review, the court below adopted too narrow a view of the Postal Service's discretion under section 1004. Consequently, we vacate the district court's judgment insofar as it grants salary increases to supervisory and other managerial personnel and establishes a fixed differential to be maintained in the future, and remand to the district court for further proceedings consistent with this opinion.

*Judgment accordingly.*