Virginia Sager SPEVAK et
al., Petitioners,

v.

DISTRICT OF COLUMBIA ALCOHOLIC
BEVERAGE CONTROL BOARD,
Respondent,

Discount Drugs Wisconsin, Inc.,
Intervenor.

No. 14038.

District of Columbia Court of Appeals.

Argued May 16, 1979.

Decided Aug. 13, 1979.

Jack I. Heller and Charles B. Ruttenberg, Washington, D. C., with whom Richard Levy, Jr., Washington, D. C., was on brief, for petitioners.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., for respondent. Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., also entered an appearance for respondent. Respondent adopted brief of intervenor.

J. E. Bindeman, Washington, D. C., with whom Stuart L. Bindeman, Washington, D. C., was on brief, for intervenor. Leonard W. Burka, Washington, D. C., also entered an appearance for intervenor.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

KELLY, Associate Judge:

█ Discount Drugs Wisconsin, Inc. [Rodman's] sought a Class B (wine and beer) beverage license from the Alcoholic Beverage Control Board [the Board]. After a complicated set of hearings, the license was granted. Petitioners, a coalition of citizen's groups, retail liquor dealers, and commissioners of the local Advisory Neighborhood Commission [ANC], appeal, alleging, *inter alia*, that the Board made inadequate findings of fact and conclusions of law and those findings it did make were not supported by substantial evidence. Petitioners also argue that the Board failed to give "great weight" to the objections of the local ANC, and erred in permitting Rodman's to reapply for a license within one year of an initial denial of its original application.[1] We affirm.

**I**

█ Initially, we consider the claim that the Board violated 3 DCRR § 2.4(a) forbidding for one year reconsideration of a denied application except when "new pertinent evidence is presented."[2] It is true, as petitioners allege, that this rule is mandatory, giving discretion to the Board only within one specific exception. *Cf. Hubbard v. District of Columbia Board of Zoning Adjustment*, D.C.App., 366 A.2d 427 (1976). Thus we must decide whether that exception—"new pertinent evidence"—was present here.

█ The facts underlying this issue are complex but essentially uncontested. Rodman's first applied for a Class B alcoholic beverage license in June of 1977. The application was opposed and hearings were held on two days in July of 1977. After the record was closed, the Board became concerned that default on a loan due Rodman by Triangle Liquors might allow Rodman to take control of Triangle, thus violating D.C. Code 1973, § 25–113(b)'s ban on dual licensing of Class A and Class B retailers.[3] It therefore asked the Corporation Counsel's opinion on whether the potential for default control of Triangle was a form of dual control forbidden by § 25–113, *supra*. The Corporation Counsel's office decided it needed further information and, without notice to opponents of the license application, had an extensive series of ex parte conversations with Rodman's counsel which

---

1. Petitioners' claim that the Board's decision was invalid because Commissioner Hill is alleged to have lived outside the District of Columbia while serving on the Board. This claim was not presented to the Commission at any time during the proceedings below and we, therefore, do not consider it here. D.C.Code 1978 Supp., § 1–1510. *Neumann Properties, Inc. v. D. C. Board of Appeals and Review*, D.C.App., 268 A.2d 605, 606 (1970).

2. 3 DCRR § 2.4 provides:
 Denial, Withdrawal, of Application.
 (a) Where an application for the issuance or transfer of an alcoholic beverage license for any place has been denied by the Alcoholic Beverage Control Board, *a second application for the same class shall not be considered within the period of one year from the date of denial of the first*; a third (and all subsequent) application for the same class shall not be considered within four years of the second (or last) denial; *Provided, however, That where on motion for leave to file a new application new pertinent evidence is presented, the Board may, in its discretion, designate an earlier date for the filing of such new application.* [Emphasis added.]

3. D.C.Code 1973, § 25–113(b) reads:
 No licensee holding a retailer's license, class C or class D, shall, by direct ownership, stock ownership, or interlocking directors, hold, directly or indirectly, any license other than retailer's licenses class C, class D, or class E. No licensee holding a retailer's license class A or class B shall, by direct ownership, stock ownership, or interlocking directors, hold, directly or indirectly, more than one license except retailer's licenses class E. When used in this subsection the word "licensee" shall include any stockholder holding directly or indirectly twenty-five per centum or more of the common stock or any officer of such licensee if such licensee is a corporation.

resulted in an early payment of the loan, thus ending the potential for Rodman to gain control over Triangle. Thereafter, on November 3, 1977, the Board granted Rodman's application, relying, in part, on a final opinion of the Corporation Counsel that there was no further potential for Rodman to assume control of a second liquor license.

Opponents of the issuance of the license immediately petitioned for reconsideration alleging, among other things, that ex parte contacts had tainted the Board's decision. The Board, after considering the petition and holding brief further hearings reversed itself and issued an order on January 31, 1978, denying Rodman's application. The denial relied solely upon the impropriety of the disputed ex parte contacts.

Ten days later Rodman's requested permission to reapply for the same license. That request was granted in an order of March 30, 1978, which was amended on April 5, 1978. Rodman's then formally reapplied for a Class B alcoholic beverage license on April 18, 1978. Opponents of the license, thus first made aware of the reapplication, immediately petitioned the Board to reconsider its grant of leave to reapply within the one-year period. Their request was denied on May 12, 1978. Hearings on the reapplication were held on May 24 and May 25, 1978, and on October 6, 1978, the Board issued a new order granting Rodman's a Class B license.[4]

The essential question here is whether the Board's grant of leave to expedited reapplication was valid, a question that turns on whether there was "new and pertinent evidence" presented to the Board. Petitioners contend that Rodman's relationship with Triangle was raised at the initial (1977) hearings and thus the end of that relationship was not "new", leaving the Board no discretion to consider a reapplication. Rodman's and the Board take the position that the retirement of the loans, dispelling the potential for dual licenses,

was new and pertinent evidence. We agree that the fact of the termination of the loans was pertinent evidence not considered at the original hearing, but are troubled by the fact that the evidence was considered by the Board before issuing either its original grant of or its later denial of the license application. In that sense it was hardly "new" evidence discovered after a denial of a license.

We are persuaded, however, that the Board's final resolution of this problem was correct. The supposedly new evidence (of the removal of an impediment to licensing) had never been considered in an adversarial setting. It was relevant to a significant and contested issue. The effect of allowing reconsideration of the licensing application was to hold a new set of hearings with full opportunities for opponents and advocates of the license to speak. This solution, while perhaps not as satisfactory as reopening the earlier hearings, certainly protected any due process concerns of all participants in the case. The fact that the Board had seen an ex parte presentation of pertinent facts did not make these facts "evidence" in the record. The Board's decision to reverse its position and deny the requested license was in fact an explicit recognition that the payment of the loan was *not* proper evidence before it. Accordingly, the loan payment was properly regarded as new evidence within the meaning of 3 DCRR § 2.4(a) which allowed the Board to exercise its discretion to consider the renewed license request.

## II

Petitioners next claim that the Board's findings of fact and conclusions of law were either inadequate or nonexistent. The legal requirements for factual findings in contested administrative cases are set out in general in the District of Columbia Administrative Procedure Act [DCAPA] at D.C.Code 1978 Supp., § 1–1509, and in par-

---

4. Requests for a stay of the license having been denied, Rodman's has been selling beer and wine pending this appeal.

ticular in subsection 1–1509(e).[5] Repeated judicial consideration of these requirements has provided us with a fairly coherent three-fold adequacy test. First, the agency (in this case the Board) must make findings on all contested issues material to the underlying substantive statute or rule. Secondly, its findings must be supported by substantial evidence apparent from the record as a whole.[6] Finally, the agency's conclusions of law must be derived rationally from findings that are in accord with the underlying statute. *Cf. Citizens Association of Georgetown, Inc. v. D. C. Zoning Commission [Safeway Stores]*, D.C.App., 402 A.2d 36 at 40–42 (1979).

Two substantive statutes underlay the issue at the 1978 hearings in this case. Opponents of the license again asserted a violation of § 25–113(b), *supra*, this time claiming that Rodman retained de facto control of McReynolds Liquors, Inc. and was therefore ineligible for a "second" retail liquor license. They also advanced the provisions of D.C.Code 1973, § 25–115(a)(6),[7] which requires that the Board issue a license only if it has found that the proposed location is an appropriate one for a license.

 The Board dealt with the § 25–113(b) issues in its findings of fact Nos. 14–16 and Nos. 33–34. A review of these findings discloses that they cover all the contested facts relevant to the statute; findings Nos. 14–16 established that no outside parties had any control over Rodman's Discount Drugs; finding No. 34 said that there was no further danger of control over sales by Triangle; and finding No. 33 established that Rodman and his wife had transferred to their sons all of their interests in

McReynolds Liquors between November 1976 and March 1977. Petitioners dispute this latter finding, pointing to 1977 testimony that Rodman's employees had handled transactions for McReynolds and that Rodman himself, in the summer of 1977, had personally signed four or five checks on behalf of McReynolds Liquors. Even if we view the record as a whole, as including the 1977 testimony, however, there is substantial evidence, both testimonial and documentary (including copies of income tax returns) to support the Board's finding that Rodman no longer had any interest in McReynolds. Finally, the third test is met. The Board's conclusion of law No. 6, that there was no § 25–113(b) violation, was rationally derived from the factual findings and is based on an appropriate reading of the statute.

Petitioners have contested the adequacy and even the existence of necessary findings of fact by the Board, specifically questioning the findings on parking and traffic, trash collection, neighborhood opinions, impact on the area, and adequacy of existing retail liquor services. Such issues are, arguably, all made relevant by § 25–115(a)(6) requiring the Board to satisfy itself:

> That the place for which the license is to be issued is an *appropriate one* considering the character of the premises, its surroundings, and the wishes of the persons residing or owning property in the neighborhood of the premises for which the license is desired.

 The Board considered parking and traffic directly in findings Nos. 21, 22 and 27 and inferentially in findings Nos. 19 and 23. It considered trash collection in finding

---

**5.** D.C.Code 1978 Supp., § 1–1509(e) provides in part:

> Every decision and order adverse to a party to the case, rendered by the Mayor or an agency in a contested case, shall be in writing and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact. Findings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence. . . .

**6.** This last phrase—"the record as a whole"— means, we take it, that a fact which seems solid and substantial when viewed in isolation may in fact become evanescent or "a mere scintilla" when seen in the context of the full record. *Cf. Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *In re Dwyer*, D.C.App., 399 A.2d 1, 11 (1979).

**7.** *See* text *infra*, at p. 553.

No. 28. Neighborhood opinion was treated in findings Nos. 24, 29 and 31 and analyzed in finding No. 30. Existing neighborhood conditions were described in findings Nos. 18, 23 and 26 and the likely impact of the license was discussed in findings Nos. 22 and 29(a). Adequacy of existing services was dealt with in findings Nos. 23, 24 and 25. All of these findings recited facts put into evidence by both sides and each finding indicated upon which facts the Board chose to rely. In none of these cases were the findings on the issues merely rote or conclusory. Since adequate findings were made on all material issues, we need only consider whether those findings are "supported by and in accordance with the reliable, probative and substantial evidence." D.C.Code 1978 Supp., § 1–1509(e), *supra*.[8]

▇▇▇ We conclude that each of the Board's findings is supported by substantial evidence. We briefly mention some of that evidence. One example is the issue of neighborhood opinion. Petitioners assert that there was "[s]ubstantial evidence of unified and widespread neighborhood opposition to the license application . . . ." This mistakes the issue. If there is substantial evidence to support the Board's finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Board. *Schiffman v. D. C. ABC Board*, D.C.App., 302 A.2d 235, 238 (1973). In this case, both Rodman's and the opposition liquor retailers conducted competing drives to secure signatures favoring and opposing the license. Petitions opposing the application were signed by 768 people while 3,654 people signed petitions in

favor of the application. The Board analyzed the petition and found that 321 of the signed opponents lived in the immediate vicinity of the store, while 287 of the signed proponents were from the immediate vicinity. The Board then considered the kind of effort each side had put into its petition campaign and the small turnout of citizens at the public hearings. Its subsequent conclusion that Rodman's was an appropriate site, "considering . . . the wishes of the persons residing in or owning property in the neighborhood" was essentially a discretionary judgment based on its overall expertise.[9] Since that conclusion was supported by substantial evidence we must accept it.

▇▇▇ The record reveals similar evidentiary support for the findings on other contested issues. A series of photographs taken at regular intervals by Rodman's employees showed that parking spaces were usually available in existing lots and testimony by Rodman indicated that he expected little increase in traffic since most of the wine and beer would be sold to existing customers. Rodman and an opposing liquor retailer both testified that truck deliveries of wine and liquor would not be a severe traffic problem. We will not judge from hindsight, the Board's decision to rely on this evidence, rather than on that submitted by petitioners. Since Rodman's trash was already collected at least six times each week it was not unreasonable for the Board to find that the additional sales would not have an adverse impact. Evidence of substantial commercial development in the area, including the Mazza Gallerie and sev-

---

8. It is true that, in some of its findings, the Board did not explain *why* it chose to rely on some evidence rather than other evidence before it. Desirable as that "ultimate in rational, elaborated decision-making" may be, it is not required. *Safeway Stores, supra*, at 45. *See generally Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 544–46, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

9. The cases cited by petitioners, *Palisades Citizens Ass'n, Inc. v. Weakly*, 166 F.Supp. 591, 597 (D.D.C.1958), *rev'd in part on other grounds sub nom. MacArthur Liquors, Inc. v.*

*Palisades Citizens Ass'n, Inc.*, 105 U.S.App. D.C. 180, 265 F.2d 372 (1959); *Clore Restaurant, Inc. v. Payne, et al.*, 72 F.Supp. 677, 681 (D.D.C.1947), do indeed stand for the proposition that neighborhood opinion is one important factor for the Board to consider. They do not, however, override the clear language of § 115(a)(6) requiring the Board to weigh other factors as well, and placing the primary responsibility for decisions with the Board. Nor do they suggest that we should show no deference to the primary assessment of that opinion made by the Board.

eral other department stores, and of Rodman's frontage on a major commercial artery, combined with the testimony that the liquor sales would be in an enclosed area entirely within Rodman's existing store and with no separate entrance clearly affords substantial support for the Board's findings on the nature of the impact of the license on the neighborhood. Finally, the Board chose to consider the adequacy of service afforded by existing liquor retailers in the area. Most opposition on this issue came from Class "A" retailers who were opposed to Class "B" licenses in general and not just to Rodman's specific request. The Board correctly noted that it was under no duty to protect existing licenses from competition. *Clark's Liquors, Inc. v. D. C. ABC Board*, D.C.App., 274 A.2d 414 (1971). Since the Board did not rest its decision to grant the license on a community need for extra services, the lack of affirmative evidence of such need was not error.

We see no conflict between the conclusions of law derived by the Board from its findings of fact and a proper reading of § 115(a)(6), *supra*. Thus the Board's findings and conclusions withstand petitioners' attacks.

### III

Inasmuch as the local Advisory Neighborhood Commission opposed the application,[10] the Board had to meet an additional requirement. The Advisory Neighborhood Commission Act of 1975 requires that the recommendations of the ANC "shall be given great weight during the deliberations by the governmental agency and those issues shall be discussed in the written rationale for the governmental decision." D.C.Code 1978 Supp., § 1–171i(d). We have held that this means making "explicit reference to each ANC issue and concern *as such*, as well as specific findings and conclusions with respect to each." *Kopff v. D. C. ABC Board*, D.C.App., 381 A.2d 1372,

1384 (1977) (emphasis in original). This is exactly what the Board did in finding of fact No. 29, a three-part finding in which the Board addressed each of the concerns raised by the ANC, by specifically discussing each concern, by citing evidence and other findings in a reasonable manner, and by explaining why it rejected the ANC's recommendation. Petitioners' complaint, in essence, is that the Board did not follow the ANC's advice. The statute makes no such mandate. What it does require is that great weight be given to, and a reasoned and specific discussion be addressed to, the issues raised. That the Board has done.

*Affirmed.*

---

**10.** Since we find, *infra*, that the Board adequately responded to the ANC's objections we need not now consider how the ANC's failure to make written recommendations (as required by D.C.Code 1978 Supp., § 1–171i(d)) affected the Board's need to consider the ANC's oral presentation. *See Friendship Neighborhood Coalition v. D. C. BZA*, D.C.App., 403 A.2d 291 at 294 (1979).