**Charles RICHARDSON, Jr., et al., Appellants,**

v.

**DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY, et al., Appellees.**

No. 79–498.

District of Columbia Court of Appeals.

Argued Feb. 6, 1980.

Decided Nov. 17, 1982.

---

Matthew B. Bogin, Washington, D.C., with whom Thomas R. Asher, Washington, D.C., was on brief, for appellants.

Stephen N. Gell, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel at the time the brief was filed, Washington, D.C., were on the brief, for appellees.

Before NEWMAN, Chief Judge, and NEBEKER and MACK, Associate Judges.

## JUDGMENT

### PER CURIAM.

This cause came on for consideration on the record on appeal, the briefs of the parties, and was argued by counsel. On consideration thereof, it is

ORDERED and ADJUDGED that the judgment of the trial court herein is affirmed.

Statement of Associate Judge NEBEKER in voting to affirm.

Statement of Chief Judge NEWMAN, dissenting, at p. 125.

NEBEKER, Associate Judge:

In 1978, the Redevelopment Land Agency (RLA) awarded two developers exclusive rights to submit development proposals for certain parcels of land in downtown Washington. The property was to be sold or leased to the developers only if the agency approved the completed proposals after a public hearing. Members of the local Advisory Neighborhood Commission (ANC) brought suit in Superior Court, claiming that the ANC was entitled to 30 days' notice before the agency began the process of selecting developers to receive the exclusive rights. The plaintiffs sought a preliminary injunction and a declaratory judgment that the agency action was unlawful. The trial court denied the injunction and dismissed the complaint for failure to state a cause of action. This appeal followed.

We are asked to review the trial court's rulings, as well as the merits of appellants' claim that the ANC was entitled to notice.

However, the only issue that this court need address is that of Superior Court jurisdiction. For the reasons discussed below, I conclude that this case is not fit for judicial intervention and was not properly before the Superior Court.

On November 20, 1975, the District of Columbia Department of Housing and Community Development issued a prospectus, on behalf of the Redevelopment Land Agency, announcing the availability for development of certain real estate parcels in downtown Washington. The property is designated as Parcels 2, 3, 4, 5, and 6 of the Metro Center and Gallery Place Development Sites.[1]

1. Parcels 2–5 are located on G Street, N.W., between 11th and 13th Streets. Parcel 6 is the   block bounded by 6th and 7th Streets, N.W.,

The prospectus emphasized that there would be no price or design competition for the parcels. Instead, the agency would employ a special two-step development procedure. The agency would first select a developer to submit a proposal for each parcel. In making this selection, the agency would interview each applicant publicly, and choose the best qualified, considering experience and management, financial resources, skills of development team members, and record of past performance. After the development team had submitted an acceptable proposal, the agency would hold a public hearing. If the agency then approved the proposal, the developer would be allowed to buy or lease the property. On Sunday, May 28, 1978, the RLA advertised in *The Washington Post,* and *The Washington Star* that it would hold a "public meeting" on June 14, 1978, to interview developers interested in acquiring exclusive rights to submit development proposals. The RLA issued no other public notice of the meeting.

The June 14 meeting was attended by two of the five members of the RLA's Board of Directors. Three development teams made presentations: Oliver T. Carr Co. (Carr), requesting parcels 2 through 5; Western Development Corp. (Western), requesting parcels 2 through 5; and Landow & Co. (Landow), requesting parcels 2 through 5. A second meeting was held July 11, also attended by only two RLA Directors, at which two additional teams were interviewed. A sixth development team expressed an interest in the parcels by letter of June 12, but was not interviewed by the RLA's Board.

All five of the development parcels are located within the boundaries of ANC 2C. The ANC was not personally notified by the RLA of either of these public meetings although the meetings were publicly announced in the May 28 issue of *The Washington Post* and *The Washington Star.* When on the day following the first public

and F and G Streets, N.W.

meeting, the Chairman of the ANC wrote to the RLA protesting the agency's failure to notify the ANC, the agency did not deem it necessary to respond. The Chairman wrote a second letter of protest on July 13 when he learned that the RLA had held a second public meeting with prospective developers two days earlier. The agency, again in its discretion, chose not to reply to this letter.

A third meeting was held on September 26, 1978, for the purpose of selecting the developers who would receive the exclusive rights. The RLA Board first summarized the criteria used by the agency staff to evaluate the various developers.[2] The staff then presented its recommendation that the agency award exclusive rights to Carr for parcels 2 through 5, and remarket parcel 6. Seven members of the public addressed the meeting, including the Chairman of ANC 2C and the representatives from other neighborhood groups. Several citizens criticized the RLA's failure to notify the neighborhood organizations or to solicit community views. Most of the citizens also testified in support of Western's application. After the public comments, the RLA Board voted to begin negotiating "exclusive right" agreements awarding parcels 2, 3, and 5 to Carr and parcel 4 to Landow. No selection was made for parcel 6.

On October 24, the RLA Board met and extended for thirty days the time for negotiating the exclusive rights contracts with Carr and Landow. Appellant Richardson, a member of ANC 2C, addressed the meeting and protested the agency's refusal to notify or consult the ANC.

The RLA Board met again on November 14 to approve the execution of the agreements that had been negotiated with Carr and Landow. Before the meeting, appellants' attorney delivered a letter to the Board asserting that the RLA's award of exclusive rights would be invalid because the ANC had not been given 30 days' notice. Appellants reiterated this contention

2. The criteria included experience and management, financial capability, minority participation and proposed affirmative action.

at the Board's meeting. Nevertheless, the RLA approved and authorized execution of the agreements with Carr and Landow.

The agreements, executed November 28, 1978, provided that in exchange for each developer's promise to prepare a development proposal at its own expense, the RLA would forego consideration of proposals from other prospective developers for a period of time. When the developer submitted a proposal that met the requirements of the urban renewal plan, and was otherwise acceptable to the agency, a public hearing would be held. If the agency then approved the proposal it would allow the developer to buy or lease the parcel.

By complaint filed on November 21, 1978, the six plaintiff-appellants sought an injunction and a declaratory judgment invalidating the agreements on the grounds that (1) the RLA acted illegally in granting the exclusive rights without notifying the ANC; (2) the RLA was required to hold a public hearing under the DCAPA and under its own regulations; and (3) the RLA acted arbitrarily in failing to give reasons for its decision.

On November 28, the day the agreements were executed, appellants moved for a preliminary injunction. Following a hearing on January 16, 1979, the court denied appellants' motion. The court also tentatively questioned whether it was proper to dismiss the complaint on the merits, subject to a resolution of all factual disputes, by treating defendants' opposition to the preliminary injunction as a motion to dismiss. Accordingly, on March 16, 1979, the parties submitted a Stipulation of Facts. By Memorandum Order of March 30, the trial court reaffirmed its denial of the preliminary injunction, and dismissed the complaint for failure to state a cause of action. The court held that the RLA's actions were non-justiciable in that they "were not the type of final policy or rule-making decisions requir-

ing the [RLA] Board to give notice and hold hearings," under D.C.Code 1981, § 1–261(a), (c)(1). We view the order as one granting summary judgment. See *Dillard v. Travelers Insurance Co.*, D.C.App., 298 A.2d 222 (1972).

In affirming the trial court's holding that this dispute was not a proper one for equitable intervention by the Superior Court in an agency action, I believe it necessary to outline the prerequisites for equitable intervention of the trial court in an ongoing agency action and to explain how these prerequisites are not met in this case. I do so because there is indication that some trial judges misunderstand the relationship between the judiciary and the administrative agencies of the District. See *In re An Inquiry into Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Institution*, D.C.App., 430 A.2d 1087 (1981). Others have frankly recognized the absence of precedential case law relevant to the jurisdiction of the Superior Court over agency conduct and have proceeded as best they could. See, e.g., *Hawkins v. District of Columbia*, C.A. No. 9489–76 (D.C.Super.Ct., April 10, 1979). See also *Board of Elections v. Democratic Central Comm.*, D.C.App., 300 A.2d 725 (1973) (trial court lacks subject matter jurisdiction to enjoin Board conduct).

The trial court may not exercise its equity jurisdiction to intervene in an agency proceeding without a showing by the complainant of (1) the likelihood of great and obvious damage, (2) the violation of an important and determined right, and (3) the absence of any other judicial or administrative remedy. See, e.g., *Utah Fuel Co. v. Coal Commission*, 306 U.S. 56, 60, 59 S.Ct. 409, 411, 83 L.Ed. 483 (1938). See also *Board of Elections v. Democratic Central Comm., supra.*

The threshold issue of Superior Court jurisdiction[3] determines the outcome of this

---

**3.** The issue is variously described as a jurisdictional question, as a matter of judicial restraint, or as a matter of standing. *See Board of Elections v. Democratic Central Comm., supra.* In the District of Columbia, the question is one of

subject matter jurisdiction because of the absence of any statutory provision providing for general jurisdiction over agency matters in Superior Court. *Cf.* D.C.Code 1981, § 11–921; 5 U.S.C. § 702 (1976). Consequently, the doc-

case. In considering its jurisdiction over agency action, a judge in Superior Court is initially restrained by the absence of a general statute authorizing review in that court. *See Money v. Cullinane,* D.C.App., 392 A.2d 998, 1000 (1978) (Nebeker, J., concurring). Occasionally, a statute does provide for review in Superior Court. *See, e.g., Columbia Realty Venture Corp. v. District of Columbia Housing Rent Commission,* D.C.App., 350 A.2d 120 (1975). A decision also may be reviewable for other reasons. *See, e.g., Gunnell Construction Co. v. Contract Appeals Board,* D.C.App., 282 A.2d 556 (1971). The federal system, on the other hand, provides by statute for general review of agency action in district courts. *See* 5 U.S.C. § 702 (1976). One must conclude, therefore, that the absence of a general statute authorizing review in Superior Court reveals a congressional intent to permit agencies of the District of Columbia to operate unimpeded by the court until a final decision has been reached in a contested case. *See* D.C.Code 1981, § 11–722. This general rule, however, is subject to exceptions as discussed below.

The second restraint on the trial judge in determining the reviewability of agency action is a practical one. Our court has never authoritatively held that parties to an agency proceeding that is neither rulemaking nor a contested case may obtain equitable relief in Superior Court. However, we have often done so in dicta. *See Capitol Hill Restoration Society, Inc. v. Moore,* D.C. App., 410 A.2d 184, 188 (1979); *American University Park Citizens Ass'n v. Burka,* D.C.App., 400 A.2d 737, 742–43 (1979); *Money v. Cullinane, supra* at 1000 n. 2; *Citizens Ass'n of Georgetown v. Zoning Commission of the District of Columbia,* D.C.App., 392 A.2d 1027, 1029 n. 3 (1978) (en banc); *Wells v. District of Columbia Board of Education,* D.C.App., 386 A.2d 703, 706 (1978); *Columbia Realty Venture Corp. v.*

*District of Columbia Housing Rent Commission, supra* at 123; *Dupont Circle Citizen's Ass'n v. District of Columbia Zoning Commission,* D.C.App., 343 A.2d 296, 308 (1975) (en banc) (Gallagher, J., concurring); *Chevy Chase Citizens Ass'n v. District of Columbia,* D.C.App., 327 A.2d 310, 317 n. 18 (1974); *Citizens Ass'n of Georgetown v. Washington,* D.C.App., 291 A.2d 699, 705 n. 17 (1972).

In resolving this matter, the general equity jurisdiction of the Superior Court is not doubted. *See McIntosh v. Washington,* D.C.App., 395 A.2d 744, 749 (1978). Whether a particular case falls within the subject matter of that jurisdiction, however, is in doubt. In the absence of statutory guidance and in the absence of judicial precedent, we must look to the federal and Supreme Court cases, based as they are on a long history of equitable enforcement of statutory rights. *See American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 107, 23 S.Ct. 33, 38, 47 L.Ed. 90 (1902).

In the absence of statutorily authorized review, a federal court will consider the well-established presumption favoring judicial review. *See Barlow v. Collins,* 397 U.S. 159, 165, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). But that presumption may be overcome by evidence of a legislative intent to foreclose judicial intervention. *See National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 463–65, 94 S.Ct. 690, 695–697, 38 L.Ed.2d 646 (1974).

In this action, it is apparent that the intent of Congress and of the City Council was to preclude judicial review under these circumstances. First, the fact that there is no general review statute in the District of Columbia, as there is in the federal system, is an important primary consideration. *Cf.* 5 U.S.C. § 702 (1976); D.C.Code 1981, § 11–722. Second, the ANC Act expressly prohibits an Advisory Neighborhood Commission from maintaining a lawsuit in its

trine must serve as a jurisdictional prerequisite. *See O'Neill v. Starobin,* D.C.App., 364 A.2d 149, 153 (1976).

In the federal system, on the other hand, agency action is often reviewable in a district court by specific statute. In that event, this

doctrine becomes one of judicial restraint and is not jurisdictional. *See, e.g., Nat'l Ass'n of Postal Supervisors v. United States Postal Service,* 195 U.S.App.D.C. 242, 251–52, 602 F.2d 420, 429–30 (1979).

own capacity. D.C.Code 1981, § 1–261(g). *See Kopff v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 381 A.2d 1372, 1376 (1977). Although merely a rule of standing, this section severely limits the scope of the direct review already available by statute. *See* D.C.Code 1981, § 11–722; D.C.Code 1981, § 1–1510. *See also Kopff, supra* at 1375. This section provides persuasive evidence[4] that the rights contained in the Act may not be asserted in a collateral attack on agency action even by members of an ANC in their individual capacities. Third, the District of Columbia Redevelopment Act of 1945, D.C.Code 1981, §§ 5–801 *et seq.,* vests the Redevelopment Land Agency with broad powers. The Act outlines a comprehensive process for reclamation and redevelopment of blighted areas of the city. I submit that given the nature of this legislation and the safeguards built into it, we should not permit judicial interference with agency proceedings based on the ANC Act which was enacted subsequent to the creation of the RLA and its powers. *See Board of Elections v. Democratic Central Comm., supra* at 728. *Cf. Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 462, 99 S.Ct. 2388, 2398, 60 L.Ed.2d 1017 (1979); *Renegotiation Board v. Bannercraft Co.,* 415 U.S. 1, 20, 94 S.Ct. 1028, 1038, 39 L.Ed.2d 123 (1973); *Aircraft & Diesel Corp. v. Hirsch,* 331 U.S. 752, 771, 67 S.Ct. 1493, 1502, 91 L.Ed. 1796 (1946) ("[I]t seems obvious, in view of the Act's terms, history, objects and the policies incorporated, that Congress clearly and at the very least intended the Tax Court's functions not only to be put in motion but to be fully performed, before judicial intervention should take place at the instance of one in appellant's position.").

In any event, this case is not fit for judicial intervention. It is axiomatic in the federal courts that "injunctive and declara-tory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v. Gardner, supra* 387 U.S. at 148, 87 S.Ct. at 1515. That the approach must be to determine the appropriateness of review is clear from *Abbott.*

> The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. [*Id.* at 149, 87 S.Ct. at 1515].

The first factor, fitness for judicial decision, involves two criteria: (1) the existence of a specific, concrete, and important right; and (2) finality in the administrative decision.

Appellants are asserting a "right" which is ephemeral. As members of an ANC, they wish to be notified of this particular RLA action. The right is hardly a specific and concrete one. If a notice duty exists, appellants' rights are derivative only. It must be clear to the trial judge from an interpretation of the statute that the complainant is objecting to the violation of a specific and direct legal right. *Leedom v. Kyne,* 358 U.S. 184, 201, 79 S.Ct. 180, 190, 3 L.Ed.2d 210 (1958). An affirmative declaration of duty owed to the complainant is necessary to qualify for the presumption of reviewability in federal court. *Id.* at 189, 79 S.Ct. at 184; *see also O'Neill v. Starobin,* note 3 *supra.*

Furthermore, the asserted right of appellants here is hardly a substantial one. It arises, if at all, from a *post hoc* reading of the ANC Act. The right is associational and is of non-constitutional dimensions, the ANC being a governmental entity. The appellants are not even parties before the

4. The standard in federal courts is clear and convincing evidence. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1966). However, such a high standard is inappropriate in our jurisdiction. The presumption of reviewability in federal courts is partly a product of statute, 5 U.S.C. § 702 (1976), and its statutory history which calls for liberal rules of review. We have no such statute and can logically draw the inference that the presumption is not to apply with equal force to this jurisdiction since Congress did not see fit to include such a provision in the District of Columbia Court Reorganization Act of 1970, Pub.L. No. 91–358, July 29, 1970.

agency. The Act permits affected citizens to provide advice to agencies regarding actions that affect their communities. Violation of an alleged notice requirement does not prohibit them from doing so. *See Shiflett v. District of Columbia Board of Appeals and Review*, D.C.App., 431 A.2d 9 (1981) (failure to provide notice to affected ANC is harmless error because petitioners did in fact learn of the agency action, voiced their concerns, and may do so now and in the future).

In further consideration of the nature of appellants' "right," I also question whether the ANC Act intends that citizens have a voice in the particular action proposed by the agency in this instance. The exclusive right contract will conditionally determine the identity of the developer and little else. I see no basis in the Act to conclude that the identity of the developer is "of significance to neighborhood planning and development." *See* D.C.Code 1981, § 1–256. These purposes are concerned with the character of the development, not the character of the developer. *See* D.C.Code 1981, § 5–801.

Judicial review ought to be withheld unless the action of the agency is plainly wrong and deprives the complainant of an important, vested right. *See, e.g., Chapman v. Santa Fe Pac. R.R. Co.*, 90 U.S.App. D.C. 34, 38, 198 F.2d 498, 502 (1951), *cert. denied*, 343 U.S. 964, 72 S.Ct. 1058, 96 L.Ed. 1361 (1952). Only by judicial *fiat* in *Kopff* is the right to notice under the ANC Act enforceable on direct review. Permitting assertion of this "right" in the Superior Court at an interim stage in an agency proceeding is a much more expansive definition of the "right" than the reasoning in the *Kopff* opinion.

This agency action is also not fit for review because it is not final. The exclusive right contract will not have final legal effect until the developer abides with the safeguards contained in D.C.Code 1981, §§ 5–806(c)–(e). The final sale or lease of

the property may not be completed without a hearing and notice to the ANC. *Id.*, § 5–806(c); D.C.Code 1981, § 1–261(a). The terms of the sale or lease may be modified by the agency in response to public input at the hearing. *Id.*, § 5–806(d). Appellants have presented no argument that permitting the RLA proceeding to run its course to the final sale or lease of the property would prohibit them from vindicating their alleged rights under the Act.

Illustrative of this prong of the ripeness doctrine is the case of *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). A drug manufacturer sought a declaratory judgment against the Food and Drug Administration's finding of probable cause that a drug manufactured by the company was adulterated. The Court refused to permit the manufacturer to challenge the agency's finding of probable cause because review was available in the subsequent administrative steps. The intermediate finding had no effect in and of itself until effectuated by further agency action. If allowed, the equitable relief sought "would have permitted interference in the early stages of an administrative determination as to specific facts, and would have prevented the regular operation of the ... procedures established by the Act." *Abbott, supra* 387 U.S. at 148, 87 S.Ct. at 1515. The same is true in this case.[5]

Examination of the second *Abbott* factor, the hardship to the complainant, also indicates that this matter is unreviewable. It is evident that any hardship to appellants is prospective and hypothetical. *Cf. Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, D.C.App., 426 A.2d 327 (1981) (approval of a preliminary application for a planned unit development is a final order in a contested case because it concludes certain legal rights, duties, and privileges of the parties). I do not read the *Kopff* decision as defining the injury to the parties in this case. *Kopff* indeed held that

---

**5.** For the purpose of applying the ripeness doctrine, there is no distinction between complainants seeking a declaratory judgment and those

seeking an injunction. *Eccles v. Peoples Bank of Lakewood*, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

"If an agency violates the ANC's statutory right to notice, the neighborhood residents are thereby injured by the ANC's inability to effectively present their views." This presumptive injury, however, does not automatically rise to a level of hardship sufficient to warrant equitable intervention by the trial court. The broad, unsupported description of the purposes of the ANC Act which is contained in *Kopff* at 1380–81 is authority only for the proposition that members of an ANC have an interest cognizable on direct review of a final agency order in a contested case. It does not support equitable review in the Superior Court of an interim step in an agency proceeding.

Furthermore, balancing the nature of the harm to appellants with the virtues of exhausting administrative procedures favors non-reviewability. It is clear that "subsequent opportunities for public involvement in the planning process operate to mitigate any injury to the ANC." I conclude that there is no legally cognizable harm to appellants by precluding review now, and that it is better to avoid an intrusion into agency proceedings for the sake of an advisory opinion.

*Jones v. District of Columbia Redevelopment Land Agency,* 162 U.S.App.D.C. 366, 499 F.2d 502 (1974), cited by appellants in their brief, is instructive on this point. Plaintiffs-citizens had sought injunctive relief prohibiting the RLA from filing a proposed Neighborhood Development Plan with the National Capital Planning Commission (NCPC) until after the RLA had completed an environmental impact statement. The RLA contended that plaintiffs had not suffered the necessary injury to obtain injunctive relief because the NCPC could modify the plan and render the RLA's impact statement an anachronism. The circuit court disagreed, holding that the NCPC's decision to approve or modify the plan was vitally affected by the environmental information and without it, plaintiffs were irreparably injured.

This case is much different. First, the National Environmental Protection Act involved in *Jones* specifically required "con-

sideration of environmental factors at all stages." There is no such explicit mandate regarding the role of an ANC in this agency proceeding. This proceeding is a discretionary step to a final decision. Second, the injury to the plaintiffs in *Jones* was much more emphatic because a late impact statement likely would be a self-serving rationalization of the full and final decision of the NCPC. Appellants in this case have no such fear because they may have full input to the RLA at the final public hearing. Furthermore, this court is unwilling to engage in the skepticism expressed by the circuit court in *Jones*—that the agency will not act according to law.

The only real objective of appellants is to vindicate a public right or interest. That right or interest may be served in subsequent administrative proceedings. To that end, the procedures contained in § 5–806(c) of the Redevelopment Act operate to mitigate any injury to the ANC. Premature adjudication would entangle the court where it ought not to be. The agency must be protected from judicial interference until its decisions are formalized. Permitting intervention by the trial court in this case, would discourage the kind of ingenuity displayed by the RLA in designing the exclusive right contract to attain its administrative objectives.

Accordingly, I vote to sustain the holding of the trial court.

NEWMAN, Chief Judge, dissenting:

In Judge Nebeker's separate statement, he concludes that this case was not fit for judicial intervention and was not properly before the Superior Court. Since his separate statement is not the opinion of the court, I do not find it necessary to respond to his analysis, which I find hopelessly flawed.

I would reverse the trial court's ruling on the merits, and therefore dissent. Before reaching the merits, however, I will discuss two preliminary issues: our jurisdiction to hear this appeal, and appellants' standing to bring this suit.

## I. JURISDICTION

The plaintiffs filed suit in Superior Court seeking injunctive and declaratory relief. Their resort to Superior Court was proper.

This case is not "contested" for purposes of the DCAPA, D.C.Code 1981, § 1–1502(8). A contested case is one in which a trial-type hearing is required either by statute or as a matter of constitutional right. *Id.; Capitol Hill Restoration Society, Inc. v. Moore,* D.C. App., 410 A.2d 184, 187 (1979); *Schneider v. District of Columbia Zoning Commission,* D.C.App., 383 A.2d 324, 326 (1978). Here no such hearing is required. Certainly the Constitution does not mandate a hearing, for there has been no deprivation of a property interest. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). The RLA statute merely requires a "public hearing, after ten days' public notice," but not until the developer's proposal has been completed and the agency is deciding whether to lease or sell the property to the developer. *See* D.C.Code 1981, § 5–806(c). Even then, only a "public hearing" is required, which is less formal in nature than the trial-type hearing accorded to contested cases. *See L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency,* 184 U.S.App.D.C. 30, 39–40, 564 F.2d 515, 524–25 (1977). Nor do the agency regulations confer contested case status here, for the regulations are tailored to simply implement the statute; the hearing requirement is not triggered until an actual lease or sale is contemplated. 28 DCRR § 13–1, 13–2(b), (c).

The award of these exclusive rights *is* an "administrative proceeding ... concerned basically with weighing particular information and arriving at a decision directed at the rights of specific parties." *Schneider, supra* at 326, quoting *Chevy Chase Citizens Association v. District of Columbia Council,* D.C.App., 327 A.2d 310, 313 (1974) (en banc). But this standard only indicates that the agency's action was adjudicative as opposed to legislative in nature. It may still be adjudication without rising to the level of a contested case. One cannot rely on the

functional test of *Schneider* alone in determining whether a case is contested; the "trial-type hearing" requirement of the DCAPA must itself be satisfied. Here, the statutory definition simply does not fit.

Because this case is not "contested," direct review of the agency's action in this court is unavailable. Nevertheless, any party aggrieved by an agency decision may bring a suit for equitable or declaratory relief in Superior Court under D.C.Code 1981, § 11–921. *Capitol Hill Restoration Society, supra* at 188; *American University Park Citizens Association v. Burka,* D.C. App., 400 A.2d 737, 742–43 (1979); *Citizens Association of Georgetown v. Zoning Commission,* D.C.App., 392 A.2d 1027, 1029 n. 3 (1978) (en banc); *Money v. Cullinane,* D.C. App., 392 A.2d 998, 1000 n. 2 (1978). Accordingly, plaintiffs' complaint for declaratory judgment was properly brought in Superior Court. This court therefore has appellate jurisdiction to review the trial court's rulings under D.C.Code 1981, § 11–721.

## II. STANDING

I disagree with the agency's claim that appellants lack standing to bring this suit. The ANC is the organization designated by statute as the official conduit for public participation in government decisionmaking. To effectuate this goal, the ANC has been granted a statutory right to notice before certain significant decisions are made, so that the ANC can inform the agency of the views of the community. The agency must then accord "great weight" to these views in making its decision. D.C.Code 1981, § 1–261(d). If an agency violates the ANC's statutory right to notice, the neighborhood residents are thereby injured by the ANC's inability to present their views effectively. Accordingly, this court held in *Kopff v. District of Columbia Alcoholic Beverage Control Board,* D.C.App., 381 A.2d 1372, 1377 (1977), that "any injury to the rights of residents to advise their government is clearly within the zone of interests" protected by the ANC act.

More broadly, the ANC scheme envisions that the organization will function as an agency "watchdog"; part of the ANC's purpose is to oversee the entire decisionmaking process and ensure that community views are considered. Any arbitrary and capricious decision affecting a legitimate ANC concern inherently injures the rights of residents to advise their government. *See Kopff, supra* at 1377. In order to redress such an injury, the residents have standing to challenge the arbitrariness of the agency's decision and the agency's failure to notify the ANC.

The agency contends that appellants lack standing because they are not entitled to notice of the agency's action under the ANC Act. This argument confuses the concept of standing with the merits of the case. The question of whether the ANC is entitled to notice is precisely the central issue we must decide in this case. The answer to that question will determine whether the appellants win or lose the lawsuit, not whether they have standing to bring it. As the Supreme Court has explained,

> [W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, *assuming justiciability of the claim,* the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.

.    .    .    .    .

[T]he constitutional standing requirement under [the federal APA consists of] allegations which, *if true,* would establish that the plaintiff had been injured in fact by the action he sought to have reviewed. [*Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38–39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (emphasis added).]

*See also Davis v. Passman,* 442 U.S. 228, 239–40 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970). This language helps to emphasize the point that appellants' injury for purposes of standing is not to be measured by the merits of their claim. In other words, the appellants are not required to prove their entire case just to get in the courthouse door. Rather, we must ask, *if* we decide in their favor, would their injury be redressed? In this case, the answer is yes.[1]

### III. THE ANC'S STATUTORY RIGHT TO NOTICE

The central issue in this case is whether the ANC was entitled by statute to 30 days' written notice. The Advisory Neighborhood Commission Act requires such notice in two cases: (1) when the agency engages in *rulemaking,* D.C.Code 1981, § 1–261(a),[2]

---

1. Plaintiffs' standing to contest lack of notice is not defeated by actual notice here, for although a few ANC members were present at the Sept. 26, Oct. 24, and Nov. 14, 1978 meetings, none attended the first two public meetings on June 14 and July 11. At any rate, actual notice to a few of the ANC members would not negate the injury to the rights of other residents to advise their government. *Kopff, supra* at 1377; *see Dupont Circle Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* D.C.App., 403 A.2d 314, 315–18 (1979) (citizens' association had standing to assert alleged failure to notify other persons of proposed special exception, despite actual notice to some members).

Only five of the six plaintiffs named in the complaint have standing. The first four were, at the time, elected members of ANC 2C, including the Chairman. The sixth plaintiff resides within the boundaries of ANC 2C. The fifth plaintiff, Helen C. Butler, however, does not reside within ANC 2C. The plaintiffs concede this in their complaint, but they do not

identify any other interest or injury that might suffice to confer standing upon this plaintiff. Nor do they allege that any other ANC, besides ANC 2C, was entitled to notice. Since Helen C. Butler does not reside within the affected ANC, she has not been injured by the agency's action, and thus she has no standing. With respect to the remaining five plaintiffs, however, *Kopff* establishes that the standing requirement is met.

2. Section 1–261(a) provides:

(a) Each advisory neighborhood commission (hereinafter in §§ 1–261 to 1–269 the "Commission") may advise the Council of the District of Columbia, the Mayor and each executive agency and all independent agencies, boards and commissions of the government of the District of Columbia with respect to all proposed matters of District government policy including decisions regarding planning, streets, recreation, social services

and (2) "before the formulation of any *final policy decision* or guideline with respect to ... *licenses,* or *permits* ...." *Id.* § 1–261(c)(1) (emphasis added).[3] In addition, the Home Rule Act requires that the agency's action be "of significance to neighborhood planning and development." *Id.* § 1–171(d). I will address each of these elements in turn.

### A. *Rulemaking*

I agree with the trial court that the agency has not engaged in rulemaking. The DCAPA defines "rulemaking" as the process of formulating "a statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of... any agency." *Id.* § 1–1502(6), (7).

Appellants insist that the broad public impact of the agency's action indicates its legislative nature. They compare the award of these exclusive rights to a decision to close a street, which we have held to be an exercise of legislative authority. *See Chevy Chase Citizens Association, supra* at 316–17. But a street-closing is vastly different from the agency action at issue here; it is a "policy decision directed toward the general public." *Id.* at 317. Here, by contrast, although the agency's action may ultimately have a broad public *impact,* the decision itself was "directed at the rights of specific individuals," *id.* at 315, quoting *Citizens Association of Georgetown v. Washington,* D.C.App., 291 A.2d 699, 704 (1972); the agency granted exclusive privileges to

two companies to submit development proposals. The award of these exclusive rights is not generalized enough to be characterized as rulemaking. Accordingly, the ANC was not entitled to notice under § 1–261(a).

### B. *Final Policy Decision*

Appellants contend that the ANC was entitled to notice because the agency's action falls within D.C.Code 1981, § 1–261(c)(1). In order to trigger the notice requirement of this subsection, the agency action must be a final policy decision, *and* it must relate to one of the items in the subsequent list (licenses, permits, etc.). *See* note 3 *supra.* In addition, the decision must be "of significance to neighborhood planning and development." *Id.* § 1–251(d); *Kopff, supra* at 1381. The first of the two criteria may be further subdivided into the questions of whether the action is a "policy decision" and whether it is "final." For the reasons discussed hereafter, I conclude that each of these elements has been satisfied and that the ANC was therefore entitled to notice before the agency awarded the exclusive rights.

### 1. *License or Permit*

Appellees argue that the "exclusive right" agreements are not licenses or permits because they do not allow the developers to engage in conduct that would otherwise be unlawful, as is true, for example, of liquor licenses. I disagree.

A permit or license empowers the grantee to perform some act that would not be allowed in the absence of such authority.

programs, education, health, safety and sanitation which affect that Commission area. For the purposes of this act, proposed actions of District government policy shall be the same as those for which prior notice of proposed *rule-making* is required pursuant to § 1–1505(a) or as pertains to the Council of the District of Columbia. [Emphasis added.]

**3.** Section 1–261(c)(1) provides in part:
In addition to those notices required in subsection (a) of this section, each agency, board and commission shall, before the award of any grant funds to a citizen organization or group, or before the formulation of any *final*

*policy decision* or guideline with respect to grant applications, comprehensive plans, requested or proposed zoning changes, variances, public improvements, *licenses,* or *permits* affecting said commission area, the District budget and city goals, and priorities, proposed changes in District government service delivery and the opening of any proposed facility systems, provide to each affected Commission notice of the proposed action as required by subsection (b) of this section. Each District of Columbia agency shall maintain a record of such notices sent to each Commission. [Emphasis added.]

The DCAPA itself defines the term "license" to include "any permit, ... approval, ... or other form of permission granted by ... any agency." D.C.Code 1981, § 1–1502(12). There is nothing in the statute restricting such "approval" or "permission" to conduct that would otherwise be unlawful.

Appellees point out that, theoretically, a developer would not be prevented from *preparing* a plan at its own expense, even without an exclusive right. But because these rights are exclusive, the agency is precluded by its own agreement from accepting or considering any other proposal. The valuable privilege at issue here, the right granted by the agency, is not the right to prepare a proposal, but rather the right to submit that proposal to the agency without competition from other developers. Accordingly, the exclusive rights bestowed by the agency here are properly characterized as licenses or permits within the meaning of § 1–261(c)(1).

### 2. *Policy Decision*

Although this was not a contested case, the RLA's action was nonetheless adjudicative, as opposed to legislative (*see* Part I *supra*) since it was based on particular information (adjudicative facts), and was directed at the rights of specific parties. *See Schneider, supra* at 326. This court held in *Kopff, supra,* that the term "policy decision or guideline" encompasses more than merely legislative-type actions; it may include adjudicative situations as well.[4] *Kopff, supra* at 1380–81. Thus the award of an exclusive right to submit a development proposal may constitute a "policy decision", even though it was adjudicative in nature.

Keeping in mind this interpretation of the statute, I conclude that the agency's award of exclusive rights was a "policy decision" relating to a license or permit, within the meaning of § 1–261(c)(1). Most of the specific agency activities listed in § 1–261(c)(1) involve "discrete, local issues"; they are seldom "the subjects of general policy-making." *Kopff, supra* at 1381. *See* note 3 *supra*. If the term "policy decision" were limited to matters of broad, general policy, it would be difficult to imagine an adjudicatory action relating to a license or permit that would ever involve a "policy decision."[5] Subsection (c) would be rendered meaningless by such an interpretation because the two categories "policy decision" and "license or permit" would be mutually exclusive. Moreover, this court held in *Kopff, supra* at 1380–81, that issuance of a liquor license was a "policy decision" within the meaning of the Act. It cannot be persuasively argued that awarding an exclusive right to submit a development proposal for a parcel of downtown property is less a "policy decision" than the award of a liquor license.

### 3. *Finality*

The agency argues that its action was not final because it had made no commitment to lease or sell the property to the developers it had selected; it had only completed the first step in the land disposition process. This argument misperceives the nature of the agency action at issue here, by failing to recognize the distinction between the ultimate disposition of the parcels, on the one hand, and the agency's decision as to who will be awarded the exclusive development rights, on the other hand. It is only the latter decision, the award of the license or permit, that is being contested here. And *that* decision is clearly final for all practical purposes. Like most licenses or permits, these rights may be temporary or subject to revocation. But that does not alter the finality of their issuance. Were the court to conclude that *these* rights are not final, as does Judge Nebeker, licenses and permits as a class would rarely, if ever, qualify as "final." The practical effect of such a construction would be to render su-

---

**4.** The *Kopff* opinion did not use the term "contested case," but referred instead to a broader group of agency adjudicative actions, which implicitly includes the agency action here.

**5.** An agency's establishment of criteria or general policies relating to the award of licenses or permits would be covered by § 1–261(a), requiring notice of agency rulemaking.

perfluous the terms "licenses" and "permits" in the statute. *See* 2A C.D. SANDS, STATUTES AND STATUTORY CONSTRUCTION § 46.06 (4th ed. 1973).[6] Thus the agency's award of exclusive development rights was "final" within the meaning of § 1–261(c)(1).

### 4. "Significance to Neighborhood Planning and Development"

The "significance" threshold is prescribed by § 738(d) of the Home Rule Act, D.C. Code 1981, § 1–251(d), which provides:

(d) In the manner provided by act of the Council, *in addition* to any other notice required by law, timely notice shall be given to each advisory neighborhood commission of requested or proposed zoning changes, variances, public improvements, licenses, or permits *of significance to neighborhood planning and development* within its neighborhood commission area for its review, comment, and recommendation. [Emphasis added.]

This court first construed the statutory term "significance" in the *Kopff* case, in which we held that, at a *minimum,* all government actions for which a prior hearing is required by law are sufficiently significant to require written notice to the affected ANC. *Kopff, supra* at 1381. In other words, every contested case will automatically be significant enough to trigger the notice requirement, as long as the terms of § 1–261(c)(1) are satisfied. *See* D.C. Code 1981, § 1–1502(8).

But *Kopff* also recognized that the term "of significance" encompasses more than just "contested cases":

---

**6.** Appellants argue that the award of exclusive rights is a "final" policy decision because it "impose[s] an obligation, den[ies] a right[,] or fix[es] some legal relationship as a consummation of the administrative process." *Washington Urban League, Inc. v. Public Service Comm'n,* D.C.App., 295 A.2d 906, 908 (1972), quoting *Chicago & So. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948); *see also Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 79–80 n. 8, 439 F.2d 584, 589–90 n. 8 (1971). Appellants also argue that an agency's decision is "final" whenever it awards an exclusive privilege to one selected from among a group of competing

---

We do not imply that all administrative agency matters for which hearings are *not* required are automatically excluded from the realm of significance. While it is difficult to conceive of many matters, not requiring a hearing, which would be sufficiently significant to neighborhood planning and development to warrant special notice to an ANC, we do not wish categorically to exclude all such cases. [*Id.* at 1381.]

*See also Shiflett v. District of Columbia Board of Appeals and Review,* D.C.App., 431 A.2d 9, 10 (1981). As discussed above, this case is not "contested." I believe, however, that it falls within that narrow category left open in *Kopff.* Even though no prior hearing is required, the award of an exclusive right to submit a development proposal is a matter "of significance to neighborhood planning and development," because it may have a tremendous impact on the type of development that occurs in these areas of downtown Washington. The award of an exclusive right creates a strong impetus toward the ultimate approval of that developer's plan. Rejection of a plan would lead to time-consuming delays, which the agency may have an economic interest in avoiding. Thus, without an opportunity to submit its views at the exclusive rights stage, the ANC may be deprived of any meaningful participation later. This risk emphasizes the "significance" of the initial selection of the developer.

Because the "significance" threshold of the Home Rule Act is satisfied, in addition to the terms of the ANC Act (Part III

---

applicants, citing *Ashbacker Radio Corp. v. FCC,* 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108 (1945) (award of radio license following a hearing required by federal statute). Although I agree with appellants' conclusion that the agency's decision was final, I reject their suggested rationale. The cases cited by appellants all involve the issue of finality for purposes of judicial review under the federal APA, which is not, nor should it be, coextensive with the definition of "final" under § 1–261(c)(1). *See Civil Aeronautics Board v. Delta Air Lines,* 367 U.S. 316, 326–28, 81 S.Ct. 1611, 1619–20, 6 L.Ed.2d 869 (1961) (finality for purposes of judicial review is not synonymous with finality for purposes of administrative action).

(B)(1)–(3) *supra*), I conclude that the ANC was entitled to notice pursuant to D.C.Code 1981, § 1–261(b).[7]

### C. Timing of the Notice

There is also a question as to the way in which the 30-day period should be measured. I construe the ANC Act to require notice, in this case, 30 days before the first public meeting, rather than 30 days before the actual decision is made.

The statute provides that the ANC must be notified 30 days before the "formulation" of any final policy decision that is within the statute. D.C.Code 1981, § 1–261(b), (c)(1). When a hearing is required by statute or by the Constitution, it is easy to determine when that "formulation" process begins—it clearly commences with the hearing, and thus the ANC is entitled to notice 30 days before the hearing is held. This case is more difficult because there is no hearing required before the agency selects a developer to receive an exclusive right. Nevertheless, the agency apparently considered its decision important enough to warrant a series of "public meetings," and it published notice of the first of those meetings (albeit not 30 days' notice), in two newspapers. It is my view, therefore, that

where the agency invites the public at large to participate in its proceedings, in this fashion, it must provide special notice to the ANC pursuant to D.C.Code 1981, § 1–261(b).[8] Thus the appropriate notice period in this case would have been 30 days before the first public meeting.

In sum, the affected ANC was entitled to 30 days' written notice before RLA began the process of selecting developers for exclusive rights, because the agency's action was a final policy decision relating to a license or permit, D.C.Code 1981, § 1–261(c)(1), and it was "of significance to neighborhood planning and development," *id.* § 1–251(d). Because the agency repeatedly ignored the ANC's requests to be kept informed of the proceedings, the ANC was thwarted in its efforts to present the community's views. The agency thus rendered itself unable to accord "great weight" to the ANC's views, as required by § 1–261(d).[9] Accordingly, I dissent.

---

**7.** I disagree with the agency's argument that requiring notice to the ANC would be inconsistent with the Supreme Court's holding in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). *Vermont Yankee* simply holds that federal courts may not impose upon agencies procedural requirements above and beyond those prescribed by statute. *Id.* at 524, 545–48, 98 S.Ct. at 1202, 1212–1214. Enforcing the notice requirement in the present case would be in complete harmony with this principle.

The ANC notice requirement is statutory. Thus the danger that *Vermont Yankee* sought to guard against, that of excessive judicial interference in the administrative process, *id.* at 548, 98 S.Ct. at 1213–14, is absent here, for it was the legislature that designed the procedural devices that this court should enforce.

**8.** Under the circumstances, the requirement of notice to the ANC would not impose a significant additional burden on the agency, since the agency already undertook to notify the newspapers. *Cf. Kopff, supra* at 1381.

**9.** In those cases in which we have required explicit findings of fact and conclusions of law by administrative agencies, under the DCAPA, D.C.Code 1981, § 1–1509(e), the organic act or regulations administered by the agency contain standards by which the agency must make its decision. *See generally Spevak v. District of Columbia Alcoholic Beverage Control Bd.,* D.C. App., 407 A.2d 549, 552–53 (1979); *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* D.C.App., 402 A.2d 36, 42, 47 (1979). Here, the organic act and the regulations contain no such standards. *See* D.C. Code 1981, § 5–806; 28 DCRR pt. 13. Nor does the DCAPA apply, since this is not a contested case. See Part I, *supra.* Nevertheless, the ANC statute requires that the views of the ANC be given "great weight" by the agency in making its decision. D.C.Code 1981, § 1–261(d); *see Kopff, supra* at 1384. While I find it unnecessary to address this issue, it is difficult to see how this court could properly perform its review function and determine whether the agency has accorded the appropriate deference to the ANC's views, unless the agency states the reasons for its decision.